**John B. MONROE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3957.**

Court of Appeals of Alaska.

Feb. 19, 1993.

Richard Keck, Asst. Public Defender, Fairbanks, and John B. Salemi, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

John B. Monroe pled no contest to a charge of second-degree murder, in violation of AS 11.41.110(a)(1). Following a sentencing hearing, Superior Court Judge Richard D. Savell found Monroe guilty but mentally ill (GBMI) and sentenced him to serve sixty years in prison. Monroe appeals, arguing that: (1) the superior court violated his privilege against self-incrimination at the GBMI hearing by allowing the state to present testimony from a psychologist who had examined Monroe for the purpose of determining his competency to stand trial; (2) the court violated Monroe's right to have his plea of no contest accepted unconditionally by adjudicating him GBMI; (3) the state presented insufficient evidence to support a finding of GBMI; and (4) the mandatory restriction on parole set forth in the GBMI statute violates Monroe's right to equal protection. Monroe further raises a number of sentencing issues. We affirm.

## FACTS

At 2:27 a.m. on June 5, 1990, the Alaska State Troopers' office in Fairbanks received a telephone call from a man who stated, "We have a stiff on our hands," and, "I [or we] need medical attention." The call was traced to John Monroe's residence, and three troopers were sent to investigate. When the troopers arrived, they were met by Monroe, who had blood on his hands and clothing. Monroe stated that he "wanted to make sure ... that he got a decent burial." Monroe then led the troopers to the body of his father, Gilbert Monroe. The body was lying on the ground near the cabin in which Monroe's father had lived. The body was covered in blood; two bloody knives had been placed on its chest.

Inside Gilbert Monroe's cabin, the troopers discovered signs of a struggle. Patterns of blood found in the cabin indicated that the struggle began inside the home and then proceeded outside. An autopsy revealed that Gilbert Monroe died from approximately thirty-three stab wounds to his head and neck. Both the victim's jugular veins and the left carotid artery had been severed. In addition, Gilbert Monroe had defensive stab wounds on his hands.

Monroe was arrested and charged with first-degree murder. At Monroe's arraignment, the state moved to have him undergo a court-ordered competency evaluation. The motion was based on the state's awareness that Monroe had a history of paranoid schizophrenia. Monroe's attorneys informed the court that they wished to seek an independent evaluation of Monroe by Drs. Rothrock and Parker. The trial court agreed to allow Monroe to seek an independent evaluation prior to intervention from the court.

After Drs. Rothrock and Parker had completed their competency evaluations, Monroe's counsel informed the court that they had found Monroe incompetent to proceed. The court then *sua sponte* ordered an independent competency evaluation, indicating in its order that Monroe's counsel could be present and could record the examination. Pursuant to court order, Monroe was examined by Dr. David Sperbeck on August 3, 1990.

Dr. Sperbeck determined that Monroe was not competent, but suggested that Monroe could attain competency through treatment. After a period of treatment, Monroe was re-examined by Dr. Rothrock, who concluded that Monroe was now able to assist his attorneys and was therefore competent to proceed. The trial court accepted Dr. Rothrock's finding of competency.

Monroe eventually entered into a plea agreement with the state. The agreement, which called upon Monroe to plead no contest to the reduced charge of murder in the second degree, expressly contemplated that, for sentencing purposes, the state would be allowed to attempt to establish that Monroe was GBMI.[1] At the change of plea hearing, counsel for Monroe indicated that Monroe would contest the GBMI issue. Prior to sentencing, the state filed formal notice of its intent to have Monroe found

GBMI. The state further filed a motion to allow Dr. Sperbeck to testify telephonically on the GBMI issue at the sentencing hearing. Monroe apparently did not object, and the motion was granted.

On April 12, 1991, Judge Savell conducted a sentencing hearing in Monroe's case. The court first addressed the GBMI issue. Dr. Sperbeck was called by the state and testified without objection from Monroe. Dr. Sperbeck stated that Monroe suffered from "one of the most severe cases of schizophrenia that I've ever seen." He noted that Monroe's illness was "very responsive to treatment," but emphasized that, in the past, Monroe had not been reliable in taking medication: when allowed to take oral medication voluntarily, Monroe would take less than the prescribed dosage, or would manipulate his doctors into prescribing smaller dosages than were necessary to treat his condition.

Dr. Sperbeck also testified that, at the time of the offense, Monroe had not had the proper amount of medication in five weeks; the amount of medication Monroe was taking at the time of the offense was "absolutely subtherapeutic." Dr. Sperbeck concluded that it was more likely than not that on the date of the offense Monroe was suffering from psychotic delusions, and that, as a result of this mental state, he could not appreciate the wrongfulness of his actions nor conform his conduct to the requirements of the law.

Based on this and other evidence, Judge Savell found Monroe GBMI. The court then proceeded to sentence Monroe under the GBMI sentencing provisions. Finding that Monroe posed an extreme danger to the community when off medication, that he had little insight into his disease, and that he could not be relied on to continue with appropriate medication, the court concluded that Monroe needed to be isolated for the safety of the public. The court

---

**1.** The Memorandum Concerning Change of Plea, signed by Monroe's counsel, contained the following passage:

[T]he defendant is aware, based upon preparation with his attorneys, that either the court or the prosecution may and likely will raise the issue of whether the defendant is guilty of

unlawfully killing his father but was mentally ill at the time of the commission of the crime. The defendant has been thoroughly advised by his attorneys of the significance of a finding of "guilty but mentally ill" and that sentencing may likely occur in accordance with AS 12.47.050.

## DISCUSSION

sentenced Monroe to sixty years' imprisonment.

Monroe initially claims that the superior court erred in allowing Dr. Sperbeck to testify on the GBMI issue. Monroe contends that, since Dr. Sperbeck had been appointed by the court to examine him solely on the issue of competency to proceed and since Monroe had not been advised of his *Miranda* rights, allowing Dr. Sperbeck to testify on the GBMI issue violated Monroe's privilege against self-incrimination. *Cf. Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *R.H. v. State*, 777 P.2d 204 (Alaska App.1989).

▪ Monroe raises this issue for the first time on appeal. Because Monroe failed to object to Dr. Sperbeck's testimony below, we review only for plain error. We will find plain error only when an obvious mistake causes substantial prejudice to the accused under circumstances establishing that the mistake did not result from a tactical choice by the accused. *Massey v. State*, 771 P.2d 448, 453 (Alaska App.1989); *Potts v. State*, 712 P.2d 385, 390 (Alaska App.1985).

▪ In the present case, the record discloses more than a passive failure to object to Dr. Sperbeck's testimony. At the outset of the GBMI hearing, Monroe's trial counsel expressly told the court that he intended to rely on Dr. Sperbeck's cross-examination to defend against the state's attempt to prove him GBMI:

> We're going to contest the finding of guilty, but mentally ill, primarily through cross-examination of Dr. Sperbeck, who examined John about two months after John had been incarcerated.

During cross-examination, defense counsel questioned Dr. Sperbeck extensively regarding Dr. Sperbeck's conclusion that Monroe willfully neglected to take his prescribed medication and schemed to have his dosage amount reduced. During this line of questioning, counsel specifically referred Dr. Sperbeck to portions of the medical records that counsel now claims were improperly relied upon.

Based on this record, it appears that Monroe's trial counsel knowingly bypassed an objection to Dr. Sperbeck's testimony for tactical reasons. Assuming *arguendo* that Dr. Sperbeck should not have been allowed to testify had Monroe objected, we find no plain error under the circumstances of this case.[2]

▪ Monroe next claims that, because he did not affirmatively place his own mental state in issue, the superior court's GBMI finding violated his right to the unconditional acceptance of his no contest plea. In asserting this claim, Monroe relies exclusively on *State v. Ruby*, 650 P.2d 412 (Alaska App.1982). That case, however, is inapposite. *Ruby*, like the cases upon which it was based,[3] stands for the limited proposition that Monroe, having already entered a plea of no contest, had no remaining grounds for objection.

---

2. Monroe argues that his failure to object to Sperbeck's testimony resulted not from a tactical decision, but from his mistaken belief that he could not object. Monroe cites AS 12.47.100, which governs competency examinations in criminal cases. The statute provides, in part:

> No statement made by the accused in the course of an examination into the mental competency of the accused provided for by this section ... may be admitted in evidence against the accused on the issue of guilt in a criminal proceeding unless the accused later relies on a defense under AS 12.47.010 or 12.47.020.

Monroe posits that trial counsel may have mistakenly believed that this provision's reference to "the issue of guilt" applied only to the determination of guilt proper. Monroe reasons that counsel may thus have foregone an objection to Sperbeck's testimony because counsel assumed

This argument, however, misconstrues the plain error rule. Although the argument raises a possibility that trial counsel's failure to object may not have been tactical, the plain error rule applies only when the record as a whole negates the possibility of tactical choice. If Monroe can establish, through extrinsic evidence, that his trial counsel's failure to object actually resulted from inadvertence or neglect, he is not precluded from filing a post-conviction relief application alleging ineffective assistance of counsel. *See, e.g., Barry v. State*, 675 P.2d 1292, 1295–96 (Alaska App.1984).

3. *See Miller v. State*, 617 P.2d 516, 518 (Alaska 1980) (citing *North Carolina v. Alford*, 400 U.S. 25, 35 n. 8, 91 S.Ct. 160, 166 n. 8, 27 L.Ed.2d 162 (1970)).

tion that a court cannot reject a knowing and voluntary plea of guilty or no contest and insist that the defendant stand trial simply because the defendant insists on claiming innocence.

Here, the superior court did not purport to reject Monroe's plea; to the contrary, the court accepted the plea, convicted Monroe on the basis of it, and sentenced him. Although the court applied the GBMI statute in imposing Monroe's sentence, this did not alter the fact that Monroe was convicted on his no contest plea. The statutory provisions applicable to findings of GBMI are essentially dispositional in nature: apart from differences in post-sentencing treatment, the consequences of being found GBMI, on the one hand, or merely guilty, on the other, are essentially the same.

Monroe cites no authority for the proposition that a defendant who is convicted on a plea of guilty or no contest is entitled to any particular form of sentence or disposition. Moreover, in this case, Monroe expressly entered into a plea agreement (and thereby secured a dismissal of the original first-degree murder charge) with the express understanding that the state would be entitled to claim that he was GBMI. Under these circumstances, we find that Monroe's claim lacks merit.

■ Monroe further argues that the evidence was insufficient to support the trial court's finding of GBMI. The adjudication of a person as GBMI is governed by AS 12.47.030(a), which provides, in relevant part:

A defendant is guilty but mentally ill if, when the defendant engaged in the criminal conduct, the defendant lacked, as a result of a mental disease or defect, the substantial capacity either to appreciate the wrongfulness of that conduct or to conform that conduct to the requirements of law.

In the present case, the state presented overwhelming evidence that Monroe was suffering from schizophrenia at the time he stabbed his father, and Monroe concedes in his brief that "[he] did not contest that he had a 'mental disease or defect.'" Dr.

Sperbeck, who had access to Monroe's prior medical records, testified that Monroe "has been consistently diagnosed as suffering from a schizophrenic disorder, paranoid type, which is chronic, and frequently becomes acute, either under stress or when the defendant discontinues his medications." Dr. Sperbeck further testified that "[Monroe] has one of the most severe cases of schizophrenia that I've ever seen." The state also presented the testimony of several mental health counselors who had worked with Monroe in the past, who all supported the conclusion that Monroe had been a longtime sufferer of schizophrenia.

Evidence that Monroe's conduct was the result of his schizophrenia, and that he met the remaining two prongs of the GBMI statute, was derived chiefly from Dr. Sperbeck's testimony. Dr. Sperbeck believed that, at the time of the assault, Monroe was suffering from an active psychosis generated by his schizophrenia. This belief stemmed from Dr. Sperbeck's knowledge of the amount of medication that Monroe had been taking in the few weeks prior to the incident, an amount the doctor described as "absolutely subtherapeutic."

Dr. Sperbeck noted that Monroe had been isolated with his father for some time prior to the attack, and that Monroe had a history of delusions encompassing those who were closest to him. Dr. Sperbeck testified that Monroe was probably acting out of fear and rage generated by a delusional conspiracy theory: "I cannot imagine that [Monroe] was capable of understanding and weighing and judging the effects of his behavior.... He must have believed that killing his father was more important than protecting himself." Thus Dr. Sperbeck concluded that Monroe could not appreciate the wrongfulness of his conduct.

Dr. Sperbeck also forcefully concluded that Monroe could not conform his conduct to the requirements of law. [Tr. 31]. In support of this conclusion, Dr. Sperbeck stated:

I believe that he was probably so distracted by his mistaken beliefs about his father and his father's intentions to-

wards him or (indiscernible) and treatment towards him that even if a policeman had been standing at his side, I doubt he would have been able to control his rage.

Dr. Sperbeck added that Monroe's actions after the murder, particularly his placing the telephone call to the state troopers, added credence to the notion that Monroe could not control his conduct.

When viewed in the light most favorable to the state, this evidence is sufficient to support the trial court's conclusion that the state met its burden of proof under AS 12.47.030(a).

■ Monroe also claims that the statutory parole restriction applicable to persons found GBMI denies him equal protection. Alaska Statute 12.47.050 states, in relevant part:

(a) If the trier of fact finds that a defendant is guilty but mentally ill, the court shall sentence the defendant as provided by law and shall enter the verdict of guilty but mentally ill as part of the judgment.

(b) The Department of Corrections shall provide mental health treatment to a defendant found guilty but mentally ill. The treatment must continue until the defendant no longer suffers from a mental disease or defect that causes the defendant to be dangerous to the public peace or safety....

(c) When treatment terminates under (b) of this section, the defendant shall be required to serve the remainder of the sentence imposed.

(d) Notwithstanding any contrary provision of law, a defendant receiving treatment under (b) of this section may not be released

(1) on furlough under AS 33.30.101— 33.30.131, except for treatment in a secure setting; or

(2) on parole.

Based on testimony indicating that he will always require treatment from schizophrenia, and assuming that no "cure" for chronic paranoid schizophrenia will be discovered in the forthcoming years, Monroe maintains that this statutory provision will deny him any opportunity for release on parole. Building on this premise, Monroe argues that he and other defendants found GBMI have been unfairly singled out for harsher treatment than defendants who are simply found "guilty."

Monroe admits that the parole restriction statute seeks to further a legitimate and substantial state interest: to protect society from offenders who pose a continuing danger to the community. Monroe nevertheless asserts that the statutory scheme infringes on the right to individual liberty. Since this is a fundamental right, argues Monroe, the state must show that the parole restriction serves a compelling interest and is the least restrictive means to further the statute's goal. *See Patrick v. Lynden Transport, Inc.*, 765 P.2d 1375, 1377 (Alaska 1988) (citing *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969)).

However, a person who stands to be sentenced upon conviction of a crime has no fundamental right to liberty. In such cases, "the individual interest affected ... is the relatively narrow interest of a convicted offender in minimizing the punishment for an offense." *Maeckle v. State*, 792 P.2d 686, 689 (Alaska App.1990).

In *Barrett v. State*, 772 P.2d 559, 573–74 (Alaska App.1989), we rejected an equal protection challenge to the restrictions on furloughs and parole inherent in the GBMI statutory scheme where the GBMI finding resulted from the defendant's having placed his mental state in issue. *See* AS 12.47.010; AS 12.47.020. We found that, as a practical matter, "[n]o responsible correctional official or parole board member would release a person into the community if he or she felt that that person was dangerous." *Barrett*, 772 P.2d at 573. We then stated that when a defendant has asserted a relationship between mental illness and criminal behavior, such an assertion justifies treating the defendant differently from the public at large. *Id.* at 574.

We noted in *Barrett* that the statutory provision allowing a GBMI finding to be made regardless of whether the defendant

placed mental health in issue, AS 12.47.060, did not "figure in this appeal." *Id.* at 574 n. 16. Monroe's equal protection claim is arguably distinguishable from that defeated in *Barrett,* since the GBMI finding in Monroe's case was entered pursuant to AS 12.47.060, over Monroe's objection. Indeed, Monroe relies on this distinction.

However, Monroe fails to specify why a finding of GBMI under AS 12.47.060 would make his equal protection claim any more tenable than that rejected in *Barrett,* and he cites no persuasive authority to support his claim. We note that the finding of GBMI in this case resulted from Monroe's election to enter into a plea agreement whose terms expressly contemplated that the state would argue for this disposition. Under the circumstances, we find no merit to Monroe's equal protection claim.[4]

▮ Monroe lastly challenges his sentence as excessive. Second-degree murder is an unclassified felony, punishable by a term of imprisonment ranging from five to ninety-nine years. AS 11.41.110(b); AS 12.-55.125(b). In imposing Monroe's sixty-year sentence, Judge Savell found that Monroe lacked insight into the nature of his illness and into the need for medication. The court found that Monroe had an "on-going resistance to voluntary medication" and that "Monroe is a very dangerous person because of his inclination to refuse medicine." The court then concluded that "[i]t is necessary at the present time to isolate Mr. Monroe from society to prevent repeated instances of conduct consistent with his disease and that which brings him before the court at this time."

In addition to the need to isolate Monroe, the court noted that Monroe apparently could not be deterred from dangerous conduct and that his prospects for rehabilitation were "shak[y]." The court also noted the particular seriousness of Monroe's conduct, which involved the murder of his own father. In summation, the court said:

> [A]t the present time, applying the *Chaney* criteria, as the court has articulated, considering the seriousness of the offense, the danger that Mr. Monroe presents at this time; the fact that a prior felony probation was not adequate to protect him or his family or members of the public; the fact that this kind of offense rears its head against those in close association with Mr. Monroe— therefore, to endanger family members or work associates, as Dr. Sperbeck indicated, all cause the court to conclude that the sentence recommended by the court is right on the mark.

In contending that his sentence is excessive, Monroe first argues that the superior court erred in failing to take into account the fact that he would likely be ineligible for parole throughout his entire term.

At sentencing, Monroe urged the court to impose a sentence within the twenty- to thirty-year benchmark range that this court has established for second-degree murder. *See Page v. State,* 657 P.2d 850, 855 (Alaska App.1983). Monroe maintained that a term exceeding the benchmark

---

4. In his reply brief, Monroe raises a separate issue—more akin to due process—in connection with his claim of equal protection. Monroe expresses concern that he may simply be deemed under "treatment" within the meaning of AS 12.47.050, and consequently be presumed dangerous and denied eligibility for parole, as long as he continues to receive any form of medication for his schizophrenia, which is a lifelong condition. Monroe notes that the statutory restrictions on parole eligibility for offenders who are found GBMI contain no procedural mechanism for a future determination of dangerousness.

We agree with Monroe that he must be provided some procedural mechanism to seek eligibility for parole or furlough by demonstrating his lack of continued dangerousness. *Cf.* AS 12.47.090(e) (giving persons who have been committed for treatment following a successful insanity defense the right to petition for review of their need for continued institutionalization). An attempt to determine the precise contours of such a mechanism at this juncture would be premature, however. Regardless of his mental condition, Monroe would be ineligible for discretionary parole for an extended period of time. In the interim, the Parole Board or the Department of Corrections may promulgate regulations addressing the problem. Assuming no regulations are enacted and there has been no intervening change in the law, Monroe will be able to ask the courts at that point to provide him a suitable procedural method to establish that he is no longer dangerous on account of mental disease or defect.

range would be particularly harsh because the statutory restriction on parole eligibility for persons found GBMI made it virtually certain that he would actually serve his entire term.

In response to Monroe's argument on this point, the sentencing judge expressed doubt as to whether Monroe's potential ineligibility for parole was a legitimate sentencing consideration:

> Aren't I prohibited ... in imposing a sentence from considering likely and anticipated release dates, either, because of parole or good time? ... I've been disallowed to do what you are inviting me to do.

Relying on this comment, Monroe contends on appeal that the sentencing judge erred in failing to consider Monroe's probable release date in fashioning his sentence. Monroe cites AS 12.55.115, which permits a sentencing judge to "further restrict the eligibility of a prisoner for discretionary parole for a term greater than that required under AS 33.16.090 and 33.16.100." Monroe reasons that, since "[a] sentencing court may restrict a prisoner's eligibility for discretionary parole beyond the time otherwise statutorily mandated[,] ... [t]his clearly means that a sentencing judge can consider actual release dates in fashioning a sentence."

The Alaska Supreme Court has observed, however, that predicting parole eligibility is at best an uncertain process; for this reason, the court has stated that "the correct approach" to sentencing should normally be "to impose an appropriate term of incarceration, considering the *Chaney* criteria, on the assumption that the entire term may be served." *Jackson v. State,* 616 P.2d 23, 24–25 (Alaska 1980) (footnotes omitted).

In the present case, the sentencing court's inquiry reflects its understanding of this precedent, and the sentencing record reflects that the court properly relied on it in fashioning Monroe's sentence. The court's sentencing remarks establish that its decision to exceed the twenty- to thirty-year benchmark for second-degree murder was based not on any misapprehension about Monroe's eligibility for parole, but rather on Monroe's history of violence (which included a prior felony conviction for a life-threatening assault), the seriousness of Monroe's conduct in the current case, and on the exceptional danger Monroe poses by virtue of his resistance to appropriate treatment.

Nothing in the record indicates that the court decided to impose a term of sixty years on the unfounded assumption that Monroe would actually be released on discretionary parole at some earlier point. Instead, it appears that the court determined that the sixty-year term it imposed would be appropriate "on the assumption that the entire term may be served." *Jackson,* 616 P.2d at 25 (footnote omitted).

Monroe nevertheless maintains that the evidence fails to support the court's finding that he has had continuing problems with treatment and cannot be counted on to take appropriate medication in the future. In advancing this argument, Monroe mistakenly construes the sentencing record in the light most favorable to himself. While there is some evidence indicating that other persons may have contributed to Monroe's ongoing problems with receiving appropriate medication, there is also abundant evidence that Monroe was himself the chief source of the difficulty.

Dr. Sperbeck testified that Monroe was intelligent and adroit at convincing his care providers to reduce his medication until he was actually taking less than was necessary. Dr. Sperbeck testified that when given medication to be taken orally, Monroe would refuse to take it: in February of 1991, Dr. Sperbeck discovered that rather than taking the 20 milligram oral dosage of Prolixin he had prescribed Monroe, Monroe was biting the pills in half, thereby reducing his dosage to five or ten milligrams.

This testimony also finds support in medical records maintained by Dr. Rothrock. In a letter to Monroe's counsel dated October 12, 1990, Dr. Rothrock wrote that when he interviewed Monroe the preceding June, Monroe "refused medication, saying that he had not taken any for a long time and did not want to now because 'I have extreme difficulties taking medicine.'" Dr.

Rothrock wrote in another letter dated January 16, 1991: "Attempts to treat [Monroe] are not too successful because [he] refuses to accept that he is ill and cooperate with treatment."

Other medical records pertaining to Monroe's past medical treatment indicate an unwillingness to comply voluntarily with treatment regimens, or a tendency to downplay the need for medication. Brian Chappell, a social worker who had worked with Monroe in the past, testified at Monroe's sentencing hearing that in March 1987, Monroe was taking his medications "sporadically." Wanda Krahn–Tuttle, Monroe's case worker at the time of the stabbing, testified that Monroe indicated to her on the day after the stabbing that he had not been taking his medication. Monroe's sister testified that, when searching Monroe's cabin after the stabbing, her step-sister had found Monroe's bottle of pills; the bottle was "full," indicating that Monroe had not been in compliance with his prescription.

Finally, at his change of plea hearing Monroe testified that just prior to his father's death, "I would take the pills ... under stress, but otherwise, I wouldn't need them. I would take them if I had difficulty sleeping or that kind of thing."

We conclude that the totality of this evidence supports the sentencing court's finding with respect to Monroe's resistance to treatment; that finding was not clearly erroneous.

Monroe further contends that the court unjustifiably ignored his prospects for rehabilitation and improperly focused on isolation as a sentencing goal. The sentencing court, however, bears primary responsibility for determining the priority and relationship of the various sentencing goals in each case. *Asitonia v. State*, 508 P.2d 1023, 1026 (Alaska 1973). We will not disturb the sentencing court's decision unless it is clearly mistaken. *Nicholas v. State*, 477 P.2d 447, 448–49 (Alaska 1970).

As we have indicated, the sentencing court's findings with respect to Monroe's resistent attitude toward treatment are well-supported by the record. As we have further noted, Monroe had previously been convicted of a life-threatening, felony assault—an offense for which he was still on probation when he committed the murder in this case. In the present case, the court's decision to emphasize isolation was not clearly mistaken.

Monroe also claims that the sentencing court unjustifiably ignored evidence that his conduct was mitigated because he acted on provocation, or in imperfect self-defense. *Cf. Gregory v. State*, 689 P.2d 508, 509 (Alaska App.1984); *Bell v. State*, 658 P.2d 787, 791 (Alaska App.1983).

The record establishes, however, that the court did not ignore this evidence; rather, it rejected the evidence as unpersuasive. The court stated, in relevant part:

> The physical evidence at the scene of the murder provide[s] a reasonable basis to reconstruct at least some things. It is reasonable to conclude or infer from the physical evidence that the attack began when Mr. Monroe was seated at his desk or table. It is there chairs overturned, it is there that there is a smear on the left arm of the chair. It is to the left side that the bulk of the stab wounds were administered, and, unlike those to the neck and throat, those in the upper left area of the face and scalp, ear and skull, appear to have been downwardly inflicted. While these indicia of aggressive attack at the commencement of the encounter do not disprove possible verbal confrontation or disagreement, they're consistent with a evidence of ... the anger, the violence, the grossly impaired functioning consistent with an acute psychotic break at that time.

The court went on to conclude that Monroe's conduct, including statements given to the court during the plea colloquy, "demonstrates, because of the paranoid and delusional thinking—his continued belief that the conduct was appropriate, as distinct from being justified in the beginning ... but, later becoming excessive in degree." The court found that the evidence showed that the attack continued "and could well have gone [on] in multiple stages," indicating that Monroe "demonstrated an extended inability to control his actions."

The sentencing court's findings concerning the circumstances surrounding the offense, and its consequent rejection of the notion that Monroe's conduct was mitigated, are not clearly erroneous.

Finally, Monroe advances a cursory argument that his sixty-year term is generally excessive. The argument seems largely predicated on the subordinate claims we have already addressed. To the extent that it is not, we find it unpersuasive. Although Monroe's mental illness was certainly a relevant factor for the court's consideration, that factor did not automatically entitle Monroe to a mitigated sentence.

*Washington v. State,* 828 P.2d 172, 175 (Alaska App.1992). Having independently reviewed the entire sentencing record, we conclude that the sentence imposed below is not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

The judgment is affirmed.