**STATE of Alaska, Petitioner,**

v.

**Karan V. CLIFTON, Respondent.**

**No. A–10941.**

Court of Appeals of Alaska.

Dec. 27, 2013.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General (opening brief), and Michael C. Geraghty, Attorney General (reply brief), Juneau, for the Petitioner.

Josie Garton, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Respondent.

Before: MANNHEIMER, Chief Judge, BOLGER, Supreme Court Justice *, and COATS, Senior Judge **.

## OPINION

MANNHEIMER, Judge.

In 1982, the Alaska legislature extensively revised the law that defines how a person's mental disease or defect affects their responsibility for criminal conduct.[1] As part of that revision, the legislature created a new type of verdict in criminal cases: the verdict of "guilty but mentally ill".

The present case involves several potential constitutional problems relating to the "guilty but mentally ill" verdict. Because of these problems, the superior court concluded that it was unconstitutional to subject defendants to this verdict.

As we explain in this opinion, the legislature has changed the manner in which the "guilty but mentally ill" verdict is litigated in the trial court. We conclude that these new procedures apply to Clifton's case, and that these new procedures resolve many of the issues in this case.

There are yet other issues presented in Clifton's case—issues that we will explain and resolve during the course of our opinion. But our ultimate conclusion is that the new procedures relating to the "guilty but mentally ill" verdict are sufficient to answer the superior court's constitutional objections. We therefore remand this case to the superior court to allow the parties to litigate whether Clifton should be found "guilty but mentally ill".

### Introduction

The present case arises from the State's prosecution of Karan V. Clifton for attempted murder, and the possibility that Clifton might be found "guilty but mentally ill".

A verdict of "guilty but mentally ill" constitutes a finding that (1) the government has proved all the elements of the charged offense (including all required culpable mental states), plus an additional finding that (2) because of mental disease or defect, the defendant "lacked ... the substantial capacity either to appreciate the wrongfulness of [their] conduct or to conform [their] conduct to the requirements of law."[2] When a defendant is found "guilty but mentally ill" (instead of merely "guilty"), the defendant must receive treatment for their mental illness while they serve their sentence, and the defendant is ineligible for parole or furlough release while they are receiving this mental health treatment.

As we are about to explain, there was substantial reason to believe that Clifton suffered from a mental disease or defect that substantially affected her cognition and behavior at the time of the attempted murder. Nevertheless, Clifton's defense attorney announced (before trial) that Clifton would not rely on a defense of insanity or on a defense

---

* Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

** Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

1. *See* SLA 1982, ch. 143, § 22.

2. AS 12.47.030(a).

of diminished capacity based on mental disease or defect.

In response, the prosecutor suggested that the State might invoke the procedure codified in the pre–2012 version of AS 12.47.060. This statute applied to cases where a defendant suffering from a mental disease or defect was tried and convicted of a crime, but no evidence of the defendant's mental disease or defect was introduced at trial—so that the jury was never asked to consider whether the defendant should be found "guilty but mentally ill" (as opposed to simply "guilty").

The pre–2012 statute allowed for a post-verdict procedure in which the prosecutor—or the court, on its own motion—could raise the issue of whether the defendant should be found "guilty but mentally ill". If the issue was raised, the trial judge was required to make a post-verdict finding as to whether the defendant was shown to be guilty but mentally ill, using a "preponderance of the evidence" standard of proof. If so, the judge then entered a verdict of "guilty but mentally ill", and this verdict had the same legal effect as if the issue had been litigated at the defendant's trial and the jury had returned a verdict of "guilty but mentally ill".

In Clifton's case, the superior court ruled that this procedure was unconstitutional, and the State petitioned us to review the superior court's decision.

### Underlying facts of Clifton's offenses

Clifton worked as a respiratory therapist at an Anchorage long-term care facility. She apparently believed that she was under covert government surveillance, and that there was a government conspiracy to sabotage her life and physically harm her. After Clifton told her supervisor and other co-workers about this conspiracy, her employer decided to require Clifton to undergo a psychiatric fitness examination.

On August 2, 2006, Clifton attended a meeting with her supervisor, Steven Mayer, and her employer's human resources manager, Kathleen Manion. During this meeting, Mayer informed Clifton that she would have to undergo a psychiatric evaluation before she could return to work. Clifton became

agitated; she declared that she would not submit to the examination, and she accused Mayer and Manion of trying to destroy her life and her livelihood.

A few moments later, Clifton drew a semi-automatic pistol from her purse, shoved the barrel against Mayer's ribs, and pulled the trigger. Fortunately, Clifton had neglected to "rack" the pistol's slide (to chamber a round), so no bullet fired.

Mayer was able to tackle Clifton and take the pistol away from her. Manion ran for help, and several other employees came to assist Mayer in restraining Clifton until the police arrived.

When the police later examined Clifton's pistol, they found that it was loaded with five rounds of ammunition. The police found another fully loaded magazine for the pistol in Clifton's purse, as well as another six loose rounds of ammunition.

Based on this incident, Clifton was indicted for attempted murder (attempting to kill Mayer). Clifton was also charged with third-degree assault for placing Manion in fear of imminent serious physical injury. Following a trial in the superior court, a jury found Clifton guilty of these crimes.

However, as we are about to explain in the next section of this opinion, Clifton has not yet been sentenced for these offenses.

### Underlying facts pertaining to the question of whether, consistent with Clifton's constitutional rights, Clifton's trial judge could make a post-trial determination as to whether she should be found "guilty but mentally ill" rather than simply "guilty"

#### (a) How the issue arose

About one year after Clifton was indicted, while she was still awaiting trial, Clifton's defense attorney asked the superior court to hold a hearing to determine if Clifton was competent to stand trial. The court sent Clifton to be evaluated at the Alaska Psychiatric Institute, locally known as "API".

Clifton was initially evaluated by psychologist Lois Michaud. Michaud concluded that Clifton was not competent. The State then asked for a second opinion, so the court

ordered another evaluation, this time by psychiatrist David Sperbeck.

Both Michaud and Sperbeck concluded that Clifton suffered from a "delusional disorder" of the "persecutory type". In August 2008, the superior court concluded that Clifton was not competent to stand trial, and the court ordered that Clifton receive treatment at API in the hope that she would recover sufficiently to stand trial.

During the ensuing months, Clifton was re-evaluated by Michaud and Sperbeck, and also by another clinician, Fred Wise. In late January 2009, the superior court concluded that Clifton was competent to stand trial, and Clifton's trial was scheduled for later that year.

In advance of trial, the State raised the issue of whether Clifton would defend the charges on the basis of mental disease or defect. Clifton's attorney declared that Clifton did not intend to rely on either the defense of insanity or the defense of diminished capacity (*i.e.*, lack of culpable mental state because of mental disease or defect). In other words, Clifton's defense attorney purposely chose not to introduce any evidence of her mental illness, even though this evidence was arguably relevant to assessing Clifton's mental state at the time of the crime.

The prosecutor indicated that even if Clifton chose not to raise a defense based on mental illness at trial, if the jury found her guilty at trial, the State might invoke the procedure codified in AS 12.47.060 (*i.e.*, the pre–2012 version of that statute) and ask the trial judge to make a post-trial finding that Clifton was "guilty but mentally ill".

### (b) The definition and consequences of a "guilty but mentally ill" verdict under Alaska law

As this Court explained in *Lewis v. State*, 195 P.3d 622, 637 (Alaska App.2008), a verdict of "guilty but mentally ill" constitutes a finding (1) that the government has proved all the elements of the charged offense (including all required culpable mental states), plus an additional finding (2) that because of mental disease or defect, the defendant "lacked ... the substantial capacity either to appreciate the wrongfulness of [their] conduct or to conform [their] conduct to the requirements of law." *See* AS 12.47.030(a).

The consequences of a "guilty but mentally ill" verdict are spelled out in AS 12.47.050. Subsection (a) of this statute declares that when a defendant is found guilty but mentally ill, the defendant receives a normal sentence for the crime—but while the defendant is serving this sentence, the Department of Corrections is required to provide mental health treatment to the defendant as long as the defendant continues to suffer from a mental disease or defect that causes the defendant to be "dangerous to the public peace or safety". *See* AS 12.47.050(b).

While the defendant is receiving this mental health treatment, the defendant is not eligible for parole and can not be released on furlough except to a secure setting. *See* AS 12.47.050(d).

Finally, under subsection (e) of the statute, if the defendant is still receiving this mental health treatment as the defendant nears the end of their sentence, and if the Commissioner of Corrections has good cause to believe that the defendant still suffers from a mental illness that causes them to be dangerous, the Commissioner is required to file a petition for the defendant's involuntary civil commitment under AS 47.30.700.

In sum, a verdict of "guilty but mentally ill" means that a defendant becomes entitled to mental health treatment during the service of their sentence, but it also means that the defendant is ineligible for parole and furlough release as long as this mental health treatment is required, and it also means that the defendant may face a petition for involuntary commitment at the end of their sentence.

Whenever a defendant raises a defense of insanity or diminished capacity (based on mental disease or defect) at trial, "guilty but mentally ill" is one of the potential verdicts that the jury must consider. *See* AS 12.47.040(a).

But the post-trial procedure at issue in Clifton's case—a procedure whereby the trial judge could make a post-trial finding that

Clifton was guilty but mentally ill—was expressly authorized by the pre–2012 version of AS 12.47.060.

This former version of AS 12.47.060(a) declared that, in cases where a criminal defendant did not present evidence of mental disease or defect to support a defense of insanity or a defense of diminished capacity, and if the defendant was convicted, "the defendant, the prosecuting attorney, or the court on its own motion [could] raise the issue of whether the defendant [was] guilty but mentally ill."

If the court or either party raised the issue of whether the defendant should be found guilty but mentally ill, the court was required to hold a hearing on this issue (either before, or at, the defendant's sentencing hearing). Based on the evidence presented at this hearing, and on any other relevant evidence presented at the defendant's trial, the court was to determine whether the defendant had been shown to be guilty but mentally ill, using a "preponderance of the evidence" standard of proof. *See* the pre 2012 version of AS 12.47.060(b)-(c).

If the court concluded that the defendant was guilty but mentally ill, the court's decision had the same legal effect as if the jury had returned a "guilty but mentally ill" verdict at trial: the defendant became entitled to receive mental health treatment, and the defendant was subject to the same restrictions on parole and furlough release.

*(c) The litigation leading to the present appeal, and a description of the superior court's decision*

Two months after the jury found Clifton guilty, and while Clifton was awaiting sentencing, the State filed a motion (pursuant to the pre–2012 version of AS 12.47.060) asking the superior court to hold a hearing to determine whether Clifton should be found "guilty but mentally ill".

In response, Clifton's attorney filed a pleading attacking the constitutionality of this post-trial procedure on several grounds.

The superior court held a hearing to receive evidence on the issue of Clifton's mental health, and then the court allowed the parties to file another round of legal memoranda.

Ultimately, the superior court concluded (using a "preponderance of the evidence" standard of proof) that Clifton was suffering from a mental disease or defect at the time of her offenses, and that this mental disease or defect rendered her "guilty but mentally ill" because she was unable to conform her conduct to the requirements of the law. However, the superior court also concluded that it would violate Clifton's constitutional rights to equal protection and due process of law if the court were to find her guilty but mentally ill.

In reaching this conclusion, the superior court relied on the fact that Clifton had never asserted a defense based on mental disease or defect. But the superior court's ruling rested primarily on two legal conclusions.

First, the superior court held that AS 12.47.050(d) is unconstitutional to the extent that it bars guilty but mentally ill defendants from being released on parole as long as they are receiving mental health treatment. The court ruled that guilty but mentally ill defendants have a "limited fundamental liberty interest" in being released on mandatory parole when their good time credit equals the time remaining to be served in their sentence. The court further found that the State had failed to articulate a "compelling interest" to justify the statutory prohibition on parole release.

Second, the superior court held that the procedure specified in the pre–2012 version of AS 12.47.060—the procedure under which the trial judge made a post-trial determination as to whether the defendant was guilty but mentally ill (as opposed to simply guilty)—violated a defendant's Sixth Amendment right to trial by jury as interpreted in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

■ As we have already described, a "guilty but mentally ill" verdict rests on a finding of fact over and above the specific elements of the defendant's crime—an additional finding that, because of mental disease or defect, the defendant "lacked ... the substantial capacity either to appreciate the

wrongfulness of [their] conduct or to conform [their] conduct to the requirements of law." And, if that finding is made, the defendant is subject to a harsher sentence—because the defendant becomes ineligible for mandatory parole release (as long as they suffer from a mental disease or defect that renders them dangerous).

Because of this, and based on the Supreme Court's decision in *Blakely*, the superior court concluded that defendants are entitled to a jury trial on the question of whether they are "guilty but mentally ill", and that defendants are further entitled to demand that the government prove this allegation beyond a reasonable doubt.

The pre–2012 version of AS 12.47.060 specified that this decision was to be made by the trial judge, and that the judge was to use a "preponderance of the evidence" standard of proof. Accordingly, the superior court concluded that this pre–2012 statute was unconstitutional.

*Clifton's proposed alternative rationale for upholding the superior court's decision*

As we just explained, the superior court found (as a factual matter) that Clifton was "guilty but mentally ill" as that phrase is defined in AS 12.47.030(a)—that, because of mental disease or defect, Clifton lacked the ability to conform her conduct to the requirements of the law. However, the superior court decided that it would be unconstitutional to enter this verdict against Clifton.

Before we address the various aspects of the superior court's decision, we must address a separate argument raised by Clifton on appeal. Clifton argues that, regardless of the legal merit of the superior court's constitutional analysis, the superior court's decision can be affirmed on a separate, independent ground.

As we noted earlier, the superior court held a post-trial evidentiary hearing to investigate the State's assertion that Clifton was guilty but mentally ill. At that hearing, the superior court heard testimony from Dr. David Sperbeck.

Dr. Sperbeck was one of the people who evaluated Clifton before trial, when her com-

petency to stand trial was at issue. In her brief to this Court, Clifton contends that when Dr. Sperbeck testified at the post-trial evidentiary hearing, he impermissibly relied on the results of the earlier competency examination.

Specifically, Clifton asserts that, because of her privilege against self-incrimination, the results of the competency examination could be used solely for the purpose of evaluating her competency to stand trial—and that it was unconstitutional to allow Dr. Sperbeck to testify about statements Clifton made during the competency examination when Sperbeck's testimony was offered for the separate purpose of proving that Clifton was guilty but mentally ill.

In her brief to this Court, Clifton asserts that the superior court "did not rule on this issue". Nevertheless, Clifton urges us to affirm the superior court's decision on this basis, because "this [C]ourt may affirm [a lower court's ruling] on any grounds apparent in the record".

The main problem with Clifton's argument is that the superior court *did* rule on this issue—and the superior court's ruling is directly adverse to Clifton's position.

On pages 7 through 10 of its written decision, the superior court expressly addressed Clifton's contention that, when Dr. Sperbeck testified as a government witness at the post-trial evidentiary hearing, Sperbeck impermissibly relied, at least in part, on his earlier examination of Clifton to determine her competency to stand trial. The superior court rejected the *factual* basis of Clifton's argument:

> [This] court does not find persuasive Clifton's argument that Dr. Sperbeck's opinion that Clifton could not conform her conduct to the requirements of the law was impermissibly influenced by his [earlier] evaluation [of] her competency to stand trial. Sperbeck testified that he could set aside this [earlier] evaluation[,] and the court accepts this assessment. The court finds Dr. Sperbeck to be an experienced and professional forensic expert who is capable of making objective assessments when required, and who would acknowl-

edge improper influence by another assessment.

For these reasons, we reject Clifton's suggestion that the superior court violated her privilege against self-incrimination when the court relied on Dr. Sperbeck's testimony in the post-trial evidentiary hearing.

We now turn to the constitutional issues presented by the superior court's refusal to enter this verdict against Clifton.

The next section of our opinion explains why we must vacate the superior court's finding that Clifton was guilty but mentally ill—why the post-trial procedures that the superior court used in Clifton's case were an unconstitutional denial of Clifton's right to trial by jury.

*The post-trial procedures prescribed in the pre–2012 version of AS 12.47.060 violated the Sixth Amendment right to jury trial as interpreted in Blakely v. Washington*

■ In *Blakely v. Washington*, the United States Supreme Court held that the Sixth Amendment guarantees criminal defendants the right to trial by jury (and the right to demand proof beyond a reasonable doubt) on any question of fact which, if resolved in the government's favor, will subject the defendant to a greater maximum sentence than would otherwise apply to the defendant's crime.[3]

Clifton stands convicted of attempted murder and third-degree assault. Under the provisions of AS 33.20, she would normally be entitled to good time credit equal to one-third of her composite sentence, and she would be entitled to release on mandatory parole when that good time credit equals the unserved portion of her active sentence of imprisonment.

This good time credit, and the accompanying right to mandatory parole, is not a discretionary aspect of Clifton's sentence. The superior court has no sentencing authority to

diminish Clifton's good time credit, or to declare her ineligible for mandatory parole. *Forster v. State*, 236 P.3d 1157, 1171 (Alaska App.2010).

Rather, Clifton's eligibility for mandatory parole can be restricted only if she is found guilty but mentally ill—only if the government proves that, because of mental disease or defect, Clifton lacked the substantial capacity either to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law.

In *Forster*, we held that when a finding of fact will deprive a defendant of their normal eligibility for mandatory parole, the defendant is entitled to demand trial by jury on that issue of fact, and to demand that the government prove that fact beyond a reasonable doubt. 236 P.3d at 1170–72. *See also Alleyne v. United States*, — U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013) (holding that there is a right to jury trial under the Sixth Amendment with respect to any finding of fact that triggers, or increases, a mandatory minimum sentence).[4]

■ As we explained earlier, the post-trial procedure described in the pre–2012 version of AS 12.47.060 (the version of the statute that was in effect when Clifton's case was litigated) authorized the trial judge to determine whether the defendant should be found "guilty but mentally ill", and it directed the judge to use a "preponderance of the evidence" standard of proof when making this decision.

Because this statute designated the judge as the finder of fact rather than the jury, and because this statute called for proof by a preponderance of the evidence rather than proof beyond a reasonable doubt, the statute violated the Sixth Amendment right to jury trial as interpreted in *Blakely*.

Normally, the next question would be whether this Court should strike down the statute in its entirety or, instead, modify the

---

3. *Blakely*, 542 U.S. at 303–04, 124 S.Ct. at 2537.

4. The United States Supreme Court's decision in *Alleyne* implicitly overrules the Alaska Supreme Court's contrary interpretation of the right to jury trial in *State v. Malloy*, 46 P.3d 949 (Alaska 2002). In *Malloy*, the Alaska Supreme Court

held that a defendant has no right to jury trial with respect to a finding of fact that increases the applicable mandatory minimum sentence but does not increase the defendant's potential maximum sentence. *Id.* at 956–57.

statutory procedures to make them comply with *Blakely*. But this question has been mooted by an action of the legislature—because, in 2012, the legislature amended AS 12.47.060 to make its procedures comply with *Blakely*. [5]

Subsection (a) of the current statute declares that if the defendant is not going to rely on a defense of mental disease or defect, and if the State wishes to litigate the question of whether the defendant should be found guilty but mentally ill, the State must notify the defendant and the court before the trial. If the underlying charges against the defendant are to be tried by a jury, the post-verdict determination of whether the defendant should be found "guilty but mentally ill" must be decided by the same jury (unless both parties agree to waive a jury on that issue). And the statute specifies that the standard of proof on this issue is "beyond a reasonable doubt".

In a separate provision of the same session law, the legislature declared that these procedural changes apply "to [all] proceedings occurring on or after the effective date of this Act", regardless of whether the defendant committed their underlying offense "before, on, or after the effective date of this Act." [6]

In other words, if this Court sends Clifton's case back to the superior court for a new post-trial determination of whether Clifton should be found "guilty but mentally ill", the legislature has already declared that the newly enacted, *Blakely* compliant procedures will apply.

*Whether there is a constitutionally adequate basis for the legislature's distinction between defendants who are simply "guilty" and defendants who are "guilty but mentally ill"*

As we explained in the preceding section of this opinion, a defendant who is found "guilty but mentally ill" is subject to a more severe sentence than a defendant who is simply found "guilty". When a defendant is found guilty but mentally ill, they must receive

mental health treatment until they no longer suffer from a mental disease or defect that renders them dangerous. *See* AS 12.47.050(b). And as long as this mandated mental health treatment continues—*i.e.*, as long as the defendant suffers from a mental disease or defect that renders them dangerous—the defendant is not eligible for release on parole or furlough.

Clifton concedes that the State has a legitimate interest in protecting the public from people who are dangerous and who pose an increased risk of recidivism. But Clifton argues that the *means* chosen by the legislature to advance this goal—the statutes pertaining to the verdict of "guilty but mentally ill"—are not sufficiently tailored to survive constitutional scrutiny.

Clifton first argues that the "guilty but mentally ill" verdict is constitutionally flawed because the legislature has unreasonably equated "mental illness" with "dangerousness".

█ We do not read AS 12.47 as equating "mental illness" with "dangerousness". Under AS 12.47.030(a), proof that a defendant suffered from mental illness at the time of the offense is not enough to support a verdict of "guilty but mentally ill". Rather, the government must prove that the defendant suffered from a mental illness *and* that, because of this mental illness, the defendant lacked the substantial capacity to appreciate the wrongfulness of their conduct or to conform their conduct to the requirements of the law.

Similarly, the mandatory mental health treatment prescribed in AS 12.47.050(b)—and the concomitant restriction on parole and furlough eligibility—does not apply to all mentally ill offenders. Rather, it only applies to defendants who have been found "guilty but mentally ill" and who *continue* to suffer from "a mental disease or defect *that causes [them] to be dangerous to the public peace or safety* ".

█ Clifton nevertheless argues (referring to the facts of her own case) that it is unreasonable and arbitrary for the legislature to draw a distinction between (1) defendants

5. SLA 2012, ch. 70, §§ 6 & 7.

6. SLA 2012, ch. 70, § 17.

who commit attempted murder and who suffer from a mental disease or defect that deprives them of the substantial capacity to appreciate the wrongfulness of their conduct or to conform their conduct to the requirements of the law, versus (2) all other defendants who commit attempted murder.

In particular, Clifton asserts that there is no good reason to impose additional restrictions on the parole eligibility of defendants in the first category—no good reason to conclude that defendants in the first category pose a greater danger to the public than defendants in the second category.

We disagree. The legislature could reasonably conclude that if a defendant suffers from a mental disease or defect that deprives them of the substantial capacity to appreciate the wrongfulness of criminal conduct, this fact is important to any assessment of whether the defendant can safely be released on parole or furlough. The legislature could likewise conclude that, even when a defendant does appreciate the wrongfulness of the criminal conduct, if the defendant nevertheless suffers from a mental disease or defect that deprives them of the substantial capacity to control their behavior and conform their conduct to the requirements of the law, this too is important to any assessment of whether the defendant can be safely released on parole or furlough.

The legislature could reasonably conclude that defendants who are found guilty but mentally ill (under either of the two clauses of the statutory definition) will be significantly less receptive to parole supervision and control.

We accordingly conclude that the legislature had sufficient justification for classifying these defendants differently (for parole and furlough purposes) from defendants who commit the same crimes but who do not suffer from a mental disease or defect that deprives them of the substantial capacity to appreciate the wrongfulness of their conduct

or to conform their conduct to the requirements of the law.

In the superior court's written decision in Clifton's case, the court noted a second, related problem: A verdict of "guilty but mentally ill" only establishes that, *at the time the defendant committed the offense,* the defendant suffered from a mental disease or defect which caused them to lack the substantial capacity to appreciate the wrongfulness of their conduct or to conform their conduct to the requirements of the law. But the continuing consequences of that verdict—the defendant's ineligibility for parole or furlough release—rest on the assumption that the defendant *continues to suffer* from a mental disease or defect that renders them dangerous. And the provisions of AS 12.47 do not include any procedure by which a defendant can show—either at sentencing or later, during the service of their sentence—that they no longer suffer from a mental disease or defect that renders them dangerous.

We noted this same problem more than twenty years ago, in *Monroe v. State.*[7] In footnote 4 of *Monroe,* 847 P.2d at 90, we declared that defendants who are found guilty but mentally ill "must be provided some procedural mechanism to seek eligibility for parole [and] furlough by demonstrating [their] lack of continued dangerousness." But we did not delve further into this issue in *Monroe* because we concluded that the issue was not yet ripe: Monroe had received a lengthy sentence, so "[r]egardless of his mental condition, Monroe would be ineligible for discretionary parole for an extended period of time."[8]

The superior court likewise concluded that this issue was not ripe in Clifton's case.

Clifton has not yet been sentenced, but she stands convicted of attempted murder, and she therefore faces a mandatory minimum sentence of 5 years' imprisonment.[9] Clifton also stands convicted of a separate third-degree assault, and she must receive a partially consecutive sentence for this crime.[10]

---

**7.** 847 P.2d 84 (Alaska App.1993).

**8.** *Id.* at 90 n. 4.

**9.** *See* AS 12.55.125(b).

**10.** *See* AS 12.55.127(c)(2)(F). *See also Scholes v. State,* 274 P.3d 496, 500 (Alaska App.2012) (construing this statute to require a sentencing court to impose at least one day of the other sentence consecutively).

Under the provisions of AS 33.16.090(b)(7), Clifton will not be eligible to apply for discretionary parole until she serves the 5-year mandatory minimum sentence for attempted murder, or one-third of her actual sentence for attempted murder (whichever is greater), *plus* one-quarter of the consecutive portion of the sentence she receives for third-degree assault.

For this reason, the superior court concluded that it was premature to decide this due process issue in Clifton's case, and the court made no ruling on the merits of this issue.

*Whether the consequences of a "guilty but mentally ill" verdict—in particular, the restriction on parole and furlough release— can lawfully be imposed on defendants who do not raise a defense at trial based on mental disease or defect*

Clifton argues that even if the legislature had an adequate basis for drawing a distinction between defendants who are "guilty" and defendants who are "guilty but mentally ill", it is nevertheless unlawful to subject a defendant to the consequences of a "guilty but mentally ill" verdict unless the defendant has affirmatively raised a defense based on mental disease or defect.

As Clifton notes in her brief to this Court, there are two main consequences of a "guilty but mentally ill" verdict: the Department of Corrections is required to provide mental health treatment to the defendant, and the defendant is ineligible for parole and furlough release while receiving this mental health treatment.

But as Clifton acknowledges, when the superior court declared the "guilty but mentally ill" verdict unconstitutional, the court did not consider, and did not rely on, the assertion that a "guilty but mentally ill" verdict leads to compulsory mental health treatment. Rather, the superior court relied on the fact that this verdict leads to a restriction on a defendant's eligibility for parole and furlough release.

Indeed, the relevant statute—AS 12.47.050(b)—does not explicitly say that defendants who are found guilty but mentally ill are thereby subject to compulsory mental health treatment. Rather, the statute says that the Department of Corrections is required to "provide" mental health treatment to defendants who are found guilty but mentally ill, and that the Department shall determine the course of this treatment. It is arguable that defendants in this situation are free to reject the Department's proposed course of treatment—although this would seemingly mean that defendants who did not spontaneously get better would never be released on parole or furlough.

(We do not speak here of the Department's separate authority to administer mental health treatment to prison inmates who, because of mental disease or defect, pose a threat to the safety of persons in the prison environment. Rather, the question is the Department's authority to administer mental health treatment under AS 12.47.050, which addresses a different concern: prisoners who, because of mental disease or defect, would pose a danger to the public safety if they were released on parole or furlough.)

We need not resolve these issues of statutory interpretation and a defendant's potential right to refuse various forms of treatment—because these issues were not litigated in the superior court, and the superior court made no rulings concerning them.

Instead, we turn to the issue that the superior court *did* decide: Is it constitutional to restrict a defendant's eligibility for parole or furlough release if (1) the defendant suffers from a mental disease or defect that renders the defendant dangerous to the public, but (2) the defendant chooses not to raise a defense to the underlying criminal charge based on mental disease or defect?

In her brief to this Court, Clifton asserts that it is fundamentally unfair for the legislature to give "disparate treatment [to] defendants who have not placed their mental illness at issue". But Clifton's brief does not explain what this "disparate" treatment is.

It is true that, under the provisions of AS 12.47.040(a), a defendant who raises the affirmative defense of insanity knows that, as a consequence, the jury will be given the op-

tion of finding the defendant "guilty but mentally ill". But this same statute also declares that the jury must be instructed on the "guilty but mentally ill" verdict in *all other cases* where evidence of the defendant's mental disease or defect was admitted at trial.

Alaska law does not require a defendant's approval before the State introduces evidence of the defendant's mental disease or defect. Under AS 12.47.020(a), such evidence "is admissible whenever it is relevant to prove that the defendant did or did not have a culpable mental state which is an element of the crime [charged]."

AS 12.47.020(a) limits the admissibility of this evidence only in the sense that if a defendant wishes to introduce evidence of their mental disease or defect to *negate* a culpable mental state, the defendant must give the State and the trial court advance notice.

■ Thus, under AS 12.47.020(a), the State can introduce evidence of a defendant's mental disease or defect if this evidence is relevant to *support* the State's allegations concerning the defendant's mental state. And if such evidence is admitted at trial, AS 12.47.040(a) declares that the jury must be instructed on the verdict of "guilty but mentally ill".

■ The procedure set forth in AS 12.47.060 (*i.e.*, the post-verdict assessment of whether a defendant should be found guilty but mentally ill) applies only in cases where neither the State nor the defendant presents evidence of the defendant's mental disease or defect during the litigation of the defendant's guilt.

But even in the cases covered by AS 12.47.060—*i.e.*, cases where no evidence of the defendant's mental illness is presented at trial, and the litigation regarding the "guilty but mentally ill" verdict occurs after the jury has found the defendant guilty—(1) the elements of the "guilty but mentally ill" verdict are the same, (2) the State bears the burden of proving those elements beyond a reasonable doubt, (3) the defendant is entitled to demand that the same jury decide both the underlying offense and the question of whether the defendant is guilty but mentally

ill, and (4) the same consequences attach to any resulting verdict of "guilty but mentally ill".

Reading between the lines of Clifton's brief, it appears that Clifton is arguing that even though she may suffer from a mental disease or defect that rendered her dangerous—either because it deprived her of the capacity to understand that attempted murder is wrong, or because it deprived her of the capacity to control her behavior and refrain from trying to commit murder—she nevertheless has a constitutional right not to be subjected to the consequences of a "guilty but mentally ill" verdict because she affirmatively chose not to raise a defense to the underlying attempted murder charge based on this mental disease or defect.

Clifton's brief offers little direct discussion of this legal contention, and scant legal authority to support it. Nor is there some self-evident constitutional impediment to the State seeking a more severe form of sentence based on an assertion about the defendant's mental state (above and beyond the elements of the charged offense), so long as (1) the defendant receives adequate advance notice and (2) the procedures under which this factual assertion is litigated comply with *Blakely*.

At its core, Clifton's argument appears to be that a "guilty but mentally ill" verdict is the "price" that a defendant risks if the defendant raises a defense based on mental disease or defect and is unsuccessful—and that the State is barred from exacting this price if the defendant does not raise a mental illness defense.

We do not view the matter in this way. As we have explained, a "guilty but mentally ill" verdict represents findings of fact that are relevant to the assessment of a defendant's dangerousness—relevant to gauging the risks that the defendant would pose to the public if they were released on parole or furlough. If a defendant suffers from a mental disease or defect, and if that mental disease or defect rendered the defendant substantially incapable of understanding that their criminal behavior was wrong, or substantially incapable of refraining from engag-

ing in that criminal behavior even though they understood that it was wrong, then there is a reasonable basis for concluding that the defendant would be less receptive to supervision and control if they were released on parole or furlough.

A defendant who suffers from this sort of mental disease or defect may choose not to raise a defense based on mental illness at trial. And there will be times (as in Clifton's case) when the State is likewise willing to litigate guilt or innocence without introducing evidence of the defendant's mental illness. In such cases, evidence of the defendant's mental disease or defect will be relevant only if the defendant is convicted, because it is relevant to the type of disposition that the sentencing court should impose on the defendant—in particular, the restriction on parole and furlough release that arises from a finding that the defendant is "guilty but mentally ill".

The post-verdict procedure that Clifton attacks—the procedure specified in AS 12.47.060—is a method that allows the State to present, and the defendant to confront, evidence of (1) the defendant's mental disease or defect and (2) the potential link between that mental illness and the defendant's capacity to appreciate the wrongfulness of their conduct or their capacity to conform their conduct to the law. There is no apparent constitutional impediment to having the State seek parole and furlough restrictions in a post-verdict proceeding, so long as the procedures for litigating this question comply with *Blakely*.

■ The current version of AS 12.47.060 does apparently comply with *Blakely*. As currently drafted, this statute essentially calls for a bifurcated trial, in front of the same finder of fact, in cases where neither party wishes to introduce evidence of the defendant's mental disease or defect on the question of the defendant's guilt or innocence, but one or both parties nevertheless wish to litigate—in a sentencing context—the issue of whether the defendant should be found guilty but mentally ill.

First, the jury hears the evidence pertaining to the defendant's guilt or innocence and reaches a decision. Then, if the jury finds the defendant guilty, the jury hears the evidence pertaining to the defendant's mental disease or defect and decides whether the defendant should be found "guilty but mentally ill".

■ Because (as this Court held in *Forster*) the defendant faces an increased maximum sentence if the jury decides in the government's favor on this issue, the defendant is entitled to trial by jury and to proof beyond a reasonable doubt. The current version of AS 12.47.060 guarantees both of these rights.

To the extent that Clifton might be arguing something else, beyond the contentions we have just discussed here, we conclude that the argument is inadequately briefed and therefore waived.

*Whether it would violate the constitutional guarantee against double jeopardy if we now ordered the superior court to hold a trial on the issue of whether Clifton should be found "guilty but mentally ill"*

To sum up the discussion thus far:

We have concluded that the legislature has a valid basis for distinguishing between defendants who are simply "guilty" of a crime and defendants who are "guilty but mentally ill" because, at the time of their offense, they suffered from a mental disease or defect that deprived them of the substantial capacity either to appreciate the wrongfulness of their conduct or to conform their conduct to the requirements of the law.

We have further concluded that it is constitutional to impose the consequences of a "guilty but mentally ill" verdict on a defendant—*i.e.*, to restrict the defendant's parole and furlough release—so long as the government is forced to prove the factual assertions underlying the finding of "guilty but mentally ill" using procedures that comply with *Blakely*.

Thus, the superior court was wrong when the court concluded that it would be unconstitutional to subject Clifton to a guilty but mentally ill finding.

The remaining question is what to do in Clifton's case. The State asks us to remand Clifton's case to the superior court, so that a jury trial can be held on the issue of whether Clifton should be found "guilty but mentally ill". Clifton argues that any new trial would violate the double jeopardy clause.

■ As we are about to explain in more detail, we conclude that a new trial will not violate the double jeopardy clause. We reach this conclusion for two reasons.

First, Clifton repeatedly urged the superior court to bifurcate the proceedings—to hold separate trials on the issues of (1) whether Clifton was guilty of the criminal charges and (2) whether Clifton was guilty but mentally ill.

The defense attorney assured the trial judge that even if the trial jury was not offered a "guilty but mentally ill" verdict, the State would have a later opportunity (if Clifton was convicted at trial) to pursue a post-verdict hearing on this issue under AS 12.47.060.

Second, the United States Supreme Court has declared that states can lawfully enact procedures which call for a separate, second trial on aggravating factors (for example, a defendant's prior convictions) if the existence of the aggravating factor "is a distinct issue", "essentially independent of the determination of [the defendant's] guilt on the underlying substantive offense." *Oyler v. Boles*, 368 U.S. 448, 452, 82 S.Ct. 501, 503–04, 7 L.Ed.2d 446 (1962).

Clifton's attorney repeatedly assured the superior court that the issue of Clifton's mental illness had no relevance to the question of her guilt of the underlying crimes. The defense attorney took this position during his arguments to the trial judge—arguments that ultimately proved successful—that Clifton's jury should not be instructed on the "guilty but mentally ill" verdict.

Given these circumstances, we conclude that Clifton abandoned any double jeopardy claim that she might otherwise have had.

### (a) The pertinent aspects of the superior court litigation

As we explained at the beginning of this opinion, the superior court and the parties engaged in pre-trial discussions concerning Clifton's mental illness and the role that evidence of that illness might play at Clifton's trial.

The prosecutor wanted to have the jury instructed on the verdict of "guilty but mentally ill", but Clifton's attorney urged the trial judge to reject the State's request.

The defense attorney told the court that it would be inappropriate to instruct the jury on the "guilty but mentally ill" verdict because (according to the defense attorney) the question of whether Clifton was guilty of attempted murder and third-degree assault "[did] not implicate [her] mental condition in the slightest".

The defense attorney told the court that he did not intend to litigate any defense based on mental disease or defect. The defense attorney declined to recite the exact details of his planned defense, but he assured the court that he "[would not] argue that [Clifton's] mental condition impacted her ability to form the requisite [culpable] mental state.... Our defense does not implicate [her] mental condition."

Upon hearing the defense attorney's remarks, the trial judge suggested that a "guilty but mentally ill" verdict should still be given to the jury, even if the defense attorney did not intend to raise a defense based on mental disease or defect, because it appeared likely that Clifton's case was going to be litigated in such a way as to raise questions about her mental condition. The defense attorney disagreed:

> *Defense Attorney:* I don't believe so. Certainly, nothing we're going to do—you know, ... we've not made [a] final decision whether Ms. Clifton's going to testify or not, so ... I can't say [with] absolute certainty, but I think there's definitely ways in which we can go about the trial without reference to her mental condition, without that becoming an issue that the jury needs to dwell upon. We're not going to be arguing that her mental condition

impacts her culpability in any way. We're not going to argue that she had a diminished capacity because of a mental defect or illness. You know, this is going to be a straightforward defense.

In response to the defense attorney's remarks, the prosecutor told the judge: "And if that's all it is, Your Honor, then we don't have an issue." In other words, the State would not press its request to have the jury instructed on the "guilty but mentally ill" verdict.

But the trial judge was not yet satisfied. He asked the defense attorney what would happen if the jury heard evidence during the trial suggesting that Clifton suffered from mental illness, and the jury sent a note to the court asking whether this evidence should make any difference to their decision. The defense attorney answered:

> *Defense Attorney:* I think the thing to do is ... write them back a note say[ing], "This is not something you've been instructed on.... You haven't heard any evidence relating to [this issue], and so it shouldn't enter your [consideration of the case]."

The defense attorney then added:

> *Defense Attorney:* And I think it's important to note, too, that this isn't the [State's] last chance to pursue a ["guilty but mentally ill"] verdict. Should Ms. Clifton be convicted, ... 12.47.060 provides the procedure through which the State can ask [that] her conviction ... be amended to a ["guilty but mentally ill"] verdict. And that's done outside the presence of [the] jury.... That's another issue altogether.... It's not as though this is the last chance to seek a ["guilty but mentally ill"] verdict.

This discussion continued for many more pages of transcript, with the defense attorney repeatedly objecting to any suggestion that Clifton's jury should be instructed concerning the verdict of "guilty but mentally ill". Again, the defense attorney repeatedly asserted that Clifton's mental illness would have no relevance to the jury's determination

of her guilt or innocence of attempted murder and third-degree assault.

After hearing these arguments, the trial judge concluded that he would have to hear the evidence at the trial before he could make an informed decision as to whether to instruct the jury about the "guilty but mentally ill" verdict.

A little later in the trial, the defense attorney presented a different argument in an effort to head off a "guilty but mentally ill" verdict: he told the trial judge that, under Alaska law, "the defense controls whether or not a ["guilty but mentally ill"] verdict can be introduced to the jury"—that, without the defendant's acquiescence, the jury could not be given this option. The defense attorney also reiterated his position that a "guilty but mentally ill" verdict "[was] absolutely unnecessary in this case".

Ultimately, the trial judge acceded to the defense attorney's position: Clifton's trial jury was not instructed on the verdict of "guilty but mentally ill".

*(b) How this procedural history relates to the double jeopardy issue*

In *State v. Dague*, 143 P.3d 988 (Alaska App.2006), this Court discussed the United States Supreme Court's decisions in *Graham v. West Virginia*[11] and *Oyler v. Boles*[12]— cases where the Supreme Court rejected double jeopardy challenges to a state procedure that allowed the State to litigate certain aggravating factors in a second jury trial. *See Dague*, 143 P.3d at 1006–07 & 1012.

We construed *Graham* and *Oyler* as allowing state legislatures to enact procedures that call for a second, separate jury trial on aggravating factors "whenever the sentence enhancement was based on facts 'essentially independent of the determination of guilt on the underlying substantive offense'." *Dague*, 143 P.3d at 1012 (quoting *Oyler*, 368 U.S. at 452, 82 S.Ct. at 503).

The current version of AS 12.47.060 creates a procedure that is well within the boundaries of *Graham* and *Oyler*—because

**11.** 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912).

**12.** 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).

AS 12.47.060 (as now written) does not call for separate trials, but rather a bifurcated trial in front of the same jury.

This type of bifurcated trial is not possible in Clifton's case, because the jury that found Clifton guilty of attempted murder and third-degree assault was discharged long ago. That jury was discharged without reaching any decision as to whether Clifton should be found "guilty but mentally ill"—but this is because Clifton's attorney did everything within his power to prevent the jury from being instructed on the possibility of a "guilty but mentally ill" verdict.

■ As a technical matter, the elements that the State must prove to establish that a defendant is "guilty but mentally ill" are distinct from the elements of the defendant's underlying offense. The State must prove all the elements of the charged offense (including all required culpable mental states), *plus* the State must prove that, because of mental disease or defect, the defendant lacked the substantial capacity either to appreciate the wrongfulness of their conduct or to conform their conduct to the requirements of the law.

There will, of course, be times when the effects of a defendant's mental illness will be relevant to the jury's assessment of the defendant's guilt—in particular, the jury's assessment of whether the defendant acted with a required culpable mental state. In such cases, evidence of the defendant's mental illness will have overlapping relevance—both to the State's proof of the elements of the charged offense, and to the State's proof of the additional elements needed to support a "guilty but mentally ill" verdict.

But when Clifton's trial judge suggested that Clifton's mental illness might have this kind of overlapping relevance in the present case, Clifton's defense attorney repeatedly assured the judge that Clifton's case would be litigated in such a way that the existence of Clifton's mental illness—and the related questions of whether that mental illness rendered Clifton incapable of appreciating the wrongfulness of her conduct, or incapable of conforming her conduct to the requirements

of the law—would be irrelevant to the jury's decision.

In the end, Clifton's jury received no instruction on the verdict of "guilty but mentally ill". And later, when the jury concluded its deliberations and the trial judge accepted the jury's verdicts and asked if the jury should be discharged, Clifton's attorney said that he had no objection.

The prosecutor likewise said that she had no objection. But as we have explained, this was after the defense attorney assured the judge and the prosecutor that the State would be free to pursue a "guilty but mentally ill" verdict *after* the trial was over—pursuant to the then-existing provisions of AS 12.47.060.

Under these circumstances, we reach the same conclusion that we reached in *Dague:* Clifton, through the actions of her attorney, waived any right she might otherwise have had to insist that a single jury decide both (1) her guilt of the underlying charges and (2) the question of whether, because of mental disease or defect, she lacked the substantial capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law.

We therefore conclude that the superior court can now lawfully convene another jury to determine whether Clifton should be found guilty but mentally ill.

(In her brief, Clifton raises various arguments concerning the type of evidence that will be admissible or inadmissible at this renewed trial. These issues are best left for the superior court.)

### Conclusion

The decision of the superior court is REVERSED, and Clifton's case is remanded to the superior court for a trial on the question of whether Clifton should be found guilty but mentally ill.

