NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

CYNTHIA LORD,

                                    Appellant,

            v.

STATE OF ALASKA,

                                    Appellee.

Court of Appeals No. A-12213
Trial Court No. 3AN-09-04469 CI

O P I N I O N

No. 2702 — April 23, 2021

Appeal from the Superior Court, Third Judicial District, Anchorage, Philip R. Volland, Judge.

Appearances: Susan Orlansky, Reeves Amodio LLC, Anchorage, under contract with the Office of Public Advocacy, for the Appellant. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, Harbison, Judge, and Smith, Senior Superior Court Judge.[*]

Judge HARBISON, writing for the Court.
Judge ALLARD, with whom Judge SMITH joins, concurring.
Judge SMITH, concurring and dissenting.

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Cynthia Lord appeals the dismissal of her application for post-conviction relief for failure to state a prima facie claim for relief. In this appeal, Lord contends that her application established a prima facie case that her trial attorneys provided her with ineffective assistance of counsel. She also contends that her application established a prima facie case that Alaska's "guilty but mentally ill" (GBMI) statutes violate the equal protection rights of defendants found GBMI by denying them the more appropriate and higher quality mental health treatment that defendants found not guilty by reason of insanity (NGI) receive.

For the reasons we explain in this opinion, we reject Lord's claims and affirm the decision of the superior court.

*Facts and proceedings*

Cynthia Lord was convicted, following a bench trial, of three counts of first-degree murder for killing her three teenage sons in 2004.[1] It was uncontested during the investigation and throughout trial that Lord was severely mentally ill. Several witnesses, including Lord, testified that she believed that a force called "Evil" was taking over the world and specifically her sons, and that the only way to save her sons was to kill them and cause them to be sent to heaven.

Lord was represented by the Public Defender Agency at trial and on direct appeal. The Agency assigned five different attorneys to represent her prior to her trial.

Lord's first attorney filed a motion for a competency evaluation. After the trial court granted the motion and found Lord competent to stand trial, her attorney filed a notice of intent to rely on the defense that Lord was not guilty by reason of insanity. That attorney also filed a motion challenging the constitutionality of Alaska's insanity

---

[1] AS 11.41.100(a)(1)(A).

statute, arguing it impermissibly precluded defendants who lacked the ability to appreciate the wrongfulness of their conduct from raising an insanity defense. The trial court rejected Lord's constitutional claim, concluding that there was no federal right to an insanity defense and that the statutory scheme did not violate the Alaska Constitution.

The State then filed notice that if Lord presented an insanity defense at trial, it would seek a verdict of guilty but mentally ill (GBMI).[2] Lord's counsel did not respond to the GBMI notice.

Lord waived her right to a jury trial. At her bench trial, she argued that she was not guilty by reason of insanity. The court rejected the insanity defense and instead found her guilty but mentally ill. Specifically, the court found that, because of the severity of her mental illness, Lord lacked the substantial capacity to appreciate the wrongfulness of her actions.

Lord appealed her conviction, raising due process and cruel and unusual punishment challenges to the insanity and GBMI statutes.[3] This Court affirmed her convictions, upholding the constitutionality of both statutes.[4]

Lord also filed an application for post-conviction relief. In her application for post-conviction relief, Lord argued that her trial attorneys provided ineffective assistance of counsel by failing to challenge the constitutionality of the GBMI statutes and by failing to interview Dr. Sperbeck, one of the State's witnesses, as to how the Department of Corrections treats GBMI inmates. Lord also argued that the GBMI statutes unconstitutionally deny equal protection to GBMI inmates, as compared to

---

[2] *See* AS 12.47.030-.050.

[3] *Lord v. State*, 262 P.3d 855, 861 (Alaska App. 2011).

[4] *Id.* at 862.

individuals found not guilty by reason of insanity, by requiring GBMI inmates to be confined in prison rather than in a mental hospital.[5]

The State filed a motion to dismiss the application for failure to state a prima facie claim for relief. The superior court accepted Lord's factual allegations but nevertheless granted the State's motion, and this appeal followed.

### *Lord's application did not state a prima facie claim for relief*

On appeal, Lord first contends that the superior court erred in dismissing her application for failure to state a prima facie claim that her trial attorneys were ineffective for: (1) failing to challenge the constitutionality of the GBMI statutes, and (2) failing to interview Dr. Sperbeck. Lord argues that she presented a prima facie case of ineffective assistance of counsel in each instance.

To establish a prima facie claim of ineffective assistance of counsel, an applicant must establish: (1) that counsel's conduct did not "fall within the range of competence displayed by [an attorney] of ordinary training and skill in the criminal law" and (2) that there is a reasonable possibility that, but for counsel's deficient performance, the outcome would have been different.[6] As part of this first showing, the applicant must rebut the presumption that trial counsel's actions reflected sound tactical considerations.[7]

Lord also contends that the superior court erred in dismissing her free-standing equal protection claim that the GBMI statutes unconstitutionally deny equal

---

[5] In her initial application for post-conviction relief, Lord provided two other free-standing constitutional arguments against the GBMI statutes. She does not renew these arguments on appeal.

[6] *Risher v. State*, 523 P.2d 421, 424-25 (Alaska 1974).

[7] *State v. Jones*, 759 P.2d 558, 569-70 (Alaska App. 1988); *see also Simeon v. State*, 90 P.3d 181, 184-85 (Alaska App. 2004).

protection to GBMI inmates, as compared to individuals found not guilty by reason of insanity.

We will now address each of these three claims in turn.

*The failure to raise a constitutional challenge to the GBMI statutes*

Lord argues that her application for post-conviction relief set out facts that, if proven, would establish that a minimally competent attorney would have challenged the GBMI statutes as violative of the Eighth Amendment, Alaska's reformation clause, and the equal protection clauses of the state and federal constitutions.

As an initial matter, we note that although there is a presumption that trial counsel's actions reflected sound tactical considerations, Lord's application clearly established a prima facie case that her attorneys' failure to file constitutional claims against the GBMI statutes was not due to any tactical decisions. As we have explained, Lord was given a series of attorneys before her trial. In their affidavits, these pretrial attorneys alleged that they either relied on those before them to have completed the necessary motion work in the case or expected the case to be quickly reassigned. Likewise, the affidavits stated that Lord's trial attorney was inexperienced and deferred to his co-counsel, who in turn saw his role only as assisting in conducting the trial.

As we have also explained, the superior court accepted Lord's factual allegations but nevertheless dismissed Lord's application as deficient. The court concluded that while a "high caliber [trial] attorney" might have raised the Eighth Amendment, right of reformation, and equal protection claims that Lord raised for the first time in her application for post-conviction relief, Lord's application did not establish that any of her attorneys fell "'below the nadir' of the range of minimally competent attorneys for their failure to raise th[ose] complex and nuanced arguments."

On appeal, Lord argues that the superior court erred in parsing each of her constitutional arguments and finding them "complex and nuanced." She asserts that the fundamental incompetence of her attorneys was in failing to raise any of the challenges to the GBMI verdict that she listed.

But Lord's arguments are significantly undermined by the fact that, although her trial attorneys did not directly challenge the constitutionality of the GBMI verdict, Lord's *appellate* attorney did raise many of these challenges in Lord's direct appeal. As the State notes, Lord's appellate attorney filed a lengthy brief attacking Alaska's insanity and GBMI statutes as violative of due process and the prohibition against cruel and unusual punishment. This Court reached the merits of those arguments, rejecting the arguments and adhering to our prior decisions in *Hart v. State* and *Barrett v. State*, where we rejected similar constitutional challenges to the insanity and GBMI statutes more than thirty years ago.[8] In other words, Lord cannot show that she was prejudiced by her trial attorneys' failure to raise certain constitutional challenges when her appellate attorney raised and argued (albeit unsuccessfully) those same constitutional challenges in her direct appeal.

Moreover, we do not see a material difference between the due process and cruel and unusual punishment claims that Lord argued (and lost) in her direct appeal, and the equal protection claims she attempted to raise in her post-conviction relief application. The central assertion of any equal protection claim is the assertion that "similarly situated" persons are being treated differently. Fundamentally, therefore, Lord's equal protection claim in this appeal is an argument that no reasonable basis exists for distinguishing between defendants found not guilty by reason of insanity (*i.e.*,

---

[8]   *Lord v. State*, 262 P.3d 855, 861-62 (Alaska App. 2011) (first citing *Hart v. State*, 702 P.2d 651, 653-59 (Alaska App. 1985); then citing *Barrett v. State*, 772 P.2d 559, 573 (Alaska App. 1989)).

defendants who, because of their mental illness, are "unable . . . to appreciate the nature and quality of their conduct") and defendants found GBMI (*i.e.*, defendants who, because of their mental illness, lack "the substantial capacity either to appreciate the wrongfulness of [their] conduct or to conform that conduct to the requirements of law"). But this is essentially the same argument as the due process argument that Lord's appellate attorney made, and this Court rejected, in Lord's direct appeal.

We also agree with the State that Lord was not prejudiced by her trial attorneys' failure to challenge the conditions of her confinement as violative of her right to reformation and the prohibition against cruel and unusual punishment. As the State correctly points out, such claims can still be raised by Lord in a separate civil lawsuit, and they are not dependent on her trial attorneys raising these constitutional grounds at sentencing.[9]

Lastly, we conclude that Lord has failed to show that she was prejudiced by the failure to challenge the restrictions on mandatory parole under the GBMI verdict.

---

[9] *See Rust v. State*, 582 P.2d 134, 143 (Alaska 1978) (recognizing the court's authority to enforce the right to necessary medical and mental health services in an independent action); *Abraham v. State*, 585 P.2d 526, 531-34 (Alaska 1978) (recognizing that an independent civil action is the proper vehicle for seeking rehabilitative treatment while in custody); *LaBarbera v. State*, 598 P.2d 947, 949 (Alaska 1979) (noting that an inmate's right to receive rehabilitative services does not confer on a court the authority to furlough a prisoner for a particular treatment program); *State v. Hiser*, 924 P.2d 1024 (Alaska App. 1996) (holding that the particulars of a prisoner's care and treatment are entrusted to the Department of Corrections, and if they are inadequate, a prisoner may bring suit against the Department); *State, Dep't of Corr. v. Lundy*, 188 P.3d 692, 696 (Alaska App. 2008) (finding that the superior court did not have subject matter jurisdiction to address the legality of the Department of Corrections' treatment decisions in a sentencing decision and could only do so in an independent civil action filed by the prisoner against the Department); *Twogood v. State*, 223 P.3d 641, 649 (Alaska App. 2010) (finding that the Department of Corrections' denial of rehabilitative sex offender treatment was not cognizable on direct appeal from a criminal proceeding).

(Alaska Statute 12.47.050(d) precludes a GBMI defendant from being released on furlough or parole unless they are no longer receiving the treatment required by AS 12.47.050(b). That treatment, in turn, is required "until the defendant no longer suffers from a mental disease or defect that causes the defendant to be dangerous to the public peace or safety."[10])

Thirty years ago, in *Barrett v. State*, this Court rejected an equal protection challenge to the restrictions on furloughs and discretionary parole inherent in the GBMI statutory scheme.[11] We found that, as a practical matter, "[n]o responsible correctional official or parole board member would release a person into the community if he or she felt that that person was dangerous."[12] We reaffirmed this holding in a later case, *Monroe v. State*.[13] However, at the time of Lord's case, we had not *explicitly* addressed any constitutional challenges to the restrictions on mandatory parole.

But this is no longer true. Two years after Lord's direct appeal, this Court issued our decision in *State v. Clifton*.[14] In *Clifton*, we rejected an argument that AS 12.47 unconstitutionally equated "mental illness" with "dangerousness" because we concluded that the statute did not make such an equivalency.[15] Instead, we emphasized that the requirement of mandatory mental health treatment (and the restriction of parole that accompanies such treatment) only applies to defendants who "*continue* to suffer

---

[10] AS 12.47.050(b).

[11] *Barrett*, 772 P.2d at 573-74.

[12] *Id.* at 573.

[13] *Monroe v. State*, 847 P.2d 84, 89 (Alaska App. 1993).

[14] *State v. Clifton*, 315 P.3d 694 (Alaska App. 2013).

[15] *Id.* at 703.

from a 'mental disease or defect *that causes [them] to be dangerous to the public peace or safety*.'"[16]  We also rejected an argument that there was "no good reason to impose additional restrictions on the parole eligibility of [GBMI defendants] — no good reason to conclude that [GBMI defendants] pose a greater danger to the public than [non-GBMI defendants]."[17]  This Court held that the legislature could reasonably conclude that a GBMI defendant's mental disease or defect was "important to any assessment of whether the defendant can be safely released on parole or furlough" and that GBMI defendants "will be significantly less receptive to parole supervision and control."[18]

In his dissent, Judge Smith argues that *Clifton* was wrongly decided.  But even if we were to agree with Judge Smith, we could not find that Lord suffered any prejudice by her attorneys' failure to raise a legal argument that we expressly rejected two years after her direct appeal.

### *The failure to interview Dr. Sperbeck*

Lord's application for post-conviction relief alleged that Dr. David Sperbeck was an expert for the State at Lord's trial, and that because of his employment at the Alaska Psychiatric Institute as well as the Department of Corrections from 1982-2005, Sperbeck was in a unique position to answer questions about the differences in care that mentally ill people experienced in Department of Corrections custody versus at the Alaska Psychiatric Institute before Lord's case went to trial.  According to Lord's application, an interview with Dr. Sperbeck would have provided information regarding the disparate care given to mentally ill individuals in Department of Corrections custody

---

[16]  *Id.* (alteration in original).

[17]  *Id.* at 704.

[18]  *Id.*

as compared to those who are found not guilty by reason of insanity— information that would have supported a constitutional attack on the GBMI statutes.

We agree with the superior court that Lord's trial attorneys were not incompetent for failing to interview Dr. Sperbeck regarding Lord's conditions of confinement if she were found GBMI. Dr. Sperbeck was an expert witness on Lord's competency to stand trial and whether Lord's psychiatric illness prevented her from appreciating the "nature and quality" of her conduct — *i.e.*, whether Lord qualified as legally insane under Alaska law.[19] Questioning Dr. Sperbeck about the conditions of Lord's confinement if she were found GBMI was not clearly within the scope of the trial attorneys' duties. Nor is Lord prejudiced by her trial attorneys' failure to challenge her future conditions of confinement, as she may still challenge her current conditions of confinement through a separate civil law suit.[20]

### *Lord's free-standing equal protection claim*

In addition to arguing that Lord's trial attorneys were ineffective for failing to interview Dr. Sperbeck to prepare a robust equal protection argument regarding the treatment of GBMI defendants as compared to the treatment of defendants found not guilty by reason of insanity, Lord's post-conviction relief application also raised a free-standing equal protection claim, relying on the affidavit from Dr. Sperbeck.

The superior court found that this constitutional challenge could have been raised on direct appeal, and it accordingly dismissed this claim pursuant to AS 12.72.020(a)(2). Lord now appeals this dismissal.

---

[19] *See* AS 12.47.010(a).

[20] See cases cited in footnote 9.

Lord argues that the court erred in finding that this equal protection challenge could have been raised on direct appeal. Specifically, she contends that the claim depended upon Dr. Sperbeck's affidavit, which was only obtained after the trial and sentencing.

The State argues that the equal protection claim could have been raised on direct appeal without Dr. Sperbeck's affidavit and that *res judicata* therefore applies.[21] We agree. Indeed, as already noted, the underlying basis of Lord's equal protection claim — that GBMI defendants are "similarly situated" to NGI defendants and therefore require equal treatment — *was* essentially argued, and rejected by this Court, in Lord's direct appeal.[22] Accordingly, given our established case law — which Lord is not challenging in this appeal — we find no error in the superior court's dismissal of the free-standing equal protection claim.

We also agree with the State that Dr. Sperbeck's affidavit supports an Eighth Amendment conditions of confinement civil lawsuit, which Lord is still entitled to pursue.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

[21] *Res judicata* not only precludes the relitigation of claims that were actually raised in the prior proceedings, but it also precludes litigation of "related claims arising out of the same transaction that could have been raised in that proceeding." *White v. State, Dep't of Nat. Res.*, 14 P.3d 956, 959 (Alaska 2000).

[22] *Lord*, 262 P.3d at 861-62.

Judge ALLARD, with whom Senior Superior Court Judge SMITH joins, concurring.

Although I join the majority opinion, I write separately to express concerns with some of our prior case law and to address what I believe to be colorable constitutional claims against Alaska's "guilty but mentally ill" verdict based on the United States Supreme Court's recent decision in *Kahler v. Kansas*.[1] As I explain in this concurrence, Alaska is a clear outlier in its harsh treatment of defendants who have been found guilty but mentally ill, and no other jurisdiction has an insanity scheme like Alaska's.

*Some background history on Alaska's GBMI verdict and the ways it differs from GBMI verdicts in other jurisdictions*

From statehood until 1972, Alaska followed a version of the *M'Naghten* rule of legal insanity.[2] The *M'Naghten* rule is derived from a 1843 British case, and it has historically been "the primary test of criminal responsibility in the United States, and the exclusive test in a majority of American jurisdictions and in England and Canada."[3]

The first prong of the *M'Naghten* test (sometimes referred to as the "cognitive incapacity" prong) asks whether the defendant knew what they were doing — *i.e.*, whether the defendant understood the "nature and quality" of their conduct. The second prong (sometimes referred to as the "moral incapacity" or "wrongfulness" prong)

---

[1] *Kahler v. Kansas*, 140 S.Ct. 1021 (2020).

[2] *Pope v. State*, 478 P.2d 801, 808-09 (Alaska 1970) (Connor, J., concurring in part and dissenting in part) (explaining history of insanity defense in Alaska); *Schade v. State*, 512 P.2d 907, 910-12 (Alaska 1973) (explaining legislature's amendments to *M'Naghten* rule).

[3] *Chase v. State*, 369 P.2d 997, 1001-02 (Alaska 1962), *overruled on other grounds by Schade*, 512 P.2d at 910-12.

asks whether the defendant had the capacity to understand that their conduct was wrong — *i.e.*, whether the defendant appreciated the wrongfulness of their actions.[4]

In 1972, Alaska's *M'Naghten* insanity test was amended to add the American Law Institute's (A.L.I.) insanity test set forth in the Model Penal Code, which considered a defendant legally insane if, as a result of mental disease or defect, they lacked "substantial capacity either to appreciate the wrongfulness of their conduct *or to conform [their] conduct to the requirements of the law*."[5] The addition of this latter "volitional incapacity" language represented an expansion of the legal test for insanity.

Notably, when the Alaska legislature amended the Alaska statutes to add the A.L.I. definition of insanity, it retained only the moral incapacity/wrongfulness prong of the *M'Naghten* test. Presumably the cognitive incapacity prong was not included in deference to Alaska Supreme Court case law that had held that the two prongs were functionally the same.[6]

In 1982, the Alaska legislature revised Alaska's insanity laws.[7] These revisions were part of a national trend that occurred in response to several high-profile cases in which defendants had been found not guilty by reason of insanity under the

---

[4] *See Kahler*, 140 S.Ct. at 1025 (explaining *M'Naghten* test).

[5] Former AS 12.45.083(a) (1972) (emphasis added); *see also Model Penal Code* § 4.01 (Proposed Official Draft 1962). In *Schade v. State*, the Alaska Supreme Court adopted the A.L.I. test as a matter of law for application to crimes committed prior to the effective date of former AS 12.45.083. *Schade*, 512 P.2d at 912.

[6] *See Chase*, 369 P.2d at 1002.

[7] SLA 1982, ch. 143, § 22.

expanded definitions of insanity that some jurisdictions had adopted in the 1960's and 1970's.[8]

For the most part, the revisions in other jurisdictions were relatively modest. Some jurisdictions eliminated the "volitional prong" from their insanity tests, and instead created a new verdict for "guilty but mentally ill" (GBMI) defendants who, because of their mental illness, were incapable of conforming their conduct to the requirements of the law. However, these jurisdictions retained the central moral incapacity/wrongfulness prong of the *M'Naghten* test in some form. Indeed, as of today, forty-five states plus the federal criminal justice system, the military justice system, and the District of Columbia provide an affirmative insanity defense that encompasses the defendant's lack of moral culpability.[9]

A few jurisdictions went farther, eliminating the insanity defense altogether. Currently, four jurisdictions — Kansas, Montana, Utah, and Idaho — do not have an affirmative insanity defense.[10]

---

[8] *See, e.g.*, Christopher Slobogin, *An End to Insanity: Recasting the Role of Mental Disability in Criminal Cases*, 86 Va. L. Rev. 1199, 1203 & n.16, 1214 (2000) (discussing the significance of the not guilty by reason of insanity acquittal of John Hinckley — who attempted to assassinate President Ronald Reagan as a result of delusions involving actress Jodie Foster — in relation to a nationwide push to narrow the scope of the insanity defense); Wallace Turner, *New Law on Insanity Plea Stirs Dispute in Alaska*, N.Y. Times, June 22, 1982, at D27 (discussing the significance of the Charles Meach case in Alaska).

[9] *See Kahler*, 140 S.Ct. at 1051-59 (Breyer, J., dissenting) (appendix surveying forty-five states, the District of Columbia, and the federal test for insanity); 10 U.S.C. § 850a(a) (2018) (military test for insanity).

[10] An affirmative insanity defense in this context means a defense that is "distinct from, and in addition to, a claim that by virtue of mental illness a person either acted unconsciously or involuntarily or was unable to formulate the necessary *mens rea* to be guilty of an offense." *See Hart v. State*, 702 P.2d 651, 656 (Alaska App. 1985) (citing *Leland v. Oregon*,

(continued...)

Alaska took an entirely unique approach. Although it ostensibly did not eliminate the insanity defense, it eliminated the moral incapacity/wrongfulness prong of the *M'Naghten* test and restricted its definition of insanity to only the first prong — the cognitive incapacity prong. Alaska also created a GBMI verdict that included not only those defendants who would have been found legally insane under the A.L.I. test, but also those defendants who would have been found legally insane under the second prong of the *M'Naghten* test even though, under Alaska Supreme Court case law, the two prongs were considered indistinguishable.[11] No other jurisdiction has taken this approach to its insanity defense.

Cynthia Lord's case puts these differences between jurisdictions into stark relief. At her trial, the superior court judge found that, because of the severity of her mental illness and psychotic delusions, Lord lacked the substantial capacity to appreciate the wrongfulness of her actions. Such a finding would result in a not guilty by reason of insanity (NGI) verdict in forty-five states, the federal criminal justice system, the military justice system, and the District of Columbia. Having been found not guilty by reason of insanity in those jurisdictions, a defendant like Lord would then be committed to the state mental hospital until such time as she could prove that she was no longer dangerous as a result of her mental illness, subject to a maximum term that represented the maximum sentence that she could have received if she had been found guilty and not legally insane.

Moreover, even if Lord had been tried in one of the jurisdictions that has abolished the insanity defense, she would still likely have ended up in a state mental

---

[10] (...continued)
343 U.S. 790 (1952)).

[11] *See id.* at 657; *see also Chase*, 369 P.2d at 1002.

hospital receiving treatment rather than incarcerated in prison. Under Kansas law, for example, a sentencing judge has the authority to commit a convicted defendant to a mental health facility rather than prison if "the defendant is in need of psychiatric care," "such treatment may materially aid in the defendant's rehabilitation," and if "the defendant and society are not likely to be endangered" by permitting the defendant to receive psychiatric care in lieu of imprisonment.[12] Evidence of mental illness can also be used at sentencing to mitigate culpability and lessen the defendant's punishment.[13]

Montana law also has provisions that seek to lessen the punishment that severely mentally ill defendants face in a jurisdiction that no longer has an affirmative insanity defense.[14] For example, mandatory minimum sentences do not apply to such defendants, and they are entitled to yearly reviews of their sentence.[15] Severely mentally ill defendants can also be committed to a mental health facility, residential facility, or developmental disabilities facility for treatment, in lieu of incarceration in a correctional institution.[16]

---

[12] Kan. Stat. Ann. § 22-3430(a).

[13] *Kahler*, 140 S.Ct. at 1031; Kan. Stat. Ann. § 21-6625(a)(6) (including among mitigating circumstances that "[t]he capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired").

[14] *See, e.g.*, *State v. Korell*, 690 P.2d 992,1002 (Mont. 1984) ("Our legislature has acted to assure that the attendant stigma of a criminal conviction is mitigated by the sentencing judge's personal consideration of the defendant's mental condition and provision for commitment to an appropriate institution for treatment, as an alternative to a sentence of imprisonment.").

[15] Mont. Code Ann. § 46-14-312(2)-(4).

[16] Mont. Code Ann. § 46-14-312(2); *see also Korell*, 690 P.2d at 996-97 ("[W]hile Montana has abolished the traditional use of insanity as a defense, alternative procedures

(continued...)

Utah law contains similar provisions. Like Alaska, Utah has a GBMI verdict — called "guilty with a mental illness" — for persons who would have been found NGI under its prior laws.[17] But Utah's GBMI verdict, which focuses on hospitalization and mitigation for defendants found GBMI, is markedly different from Alaska's GBMI verdict, which contains no mitigation measures and does not directly provide for hospitalization of these defendants. Upon a plea or verdict of "guilty with a mental illness," the Utah court will order the defendant committed to the state hospital until the defendant is no longer mentally ill or can be safely treated in prison.[18] Utah law also gives the court the authority to resentence a defendant who has been found "guilty with a mental illness" following treatment and stabilization in the state hospital.[19] In addition, Utah law provides for special mitigation measures for severely mentally ill defendants like Lord who commit homicides while suffering from a delusion that made them believe that their actions were justified.[20]

Idaho also has statutory protections for defendants with severe mental illnesses. Under Idaho's sentencing scheme, a trial court must consider a defendant's

---

[16] (...continued) have been enacted to deal with insane individuals who commit criminal acts.").

[17] *See* Utah Code Ann. §§ 77-16a-102, 76-2-305; *State v. Herrera*, 895 P.2d 359, 362 (Utah 1995) (explaining Utah's approach to the insanity defense).

[18] Utah Code Ann. §§ 77-16a-104, -202 to -203. The court also has the authority to extend such placement or to order re-commitment to the state hospital if appropriate. Utah Code Ann. § 77-16a-202.

[19] Utah Code Ann. § 77-16a-202(1)(b). This provision does not apply to capital crimes. Utah Code Ann. § 77-16a-202(2).

[20] Utah Code Ann. § 76-5-205.5. Specifically, this section reduces the level of criminal culpability from aggravated murder to murder or from murder to manslaughter. Utah Code Ann. § 76-5-205.5(5).

mental illness, including their ability to appreciate the wrongfulness of their actions, as a mitigating factor when fashioning a sentence.[21]  Additionally, a trial court may order a defendant to receive mental health treatment during the period of confinement or probation.[22]  Indeed, the existence of these sentencing safeguards was integral to the Idaho Supreme Court's decision to uphold its legislature's abolition of the insanity defense.[23]

In contrast, there are no provisions in Alaska law that give the courts the authority to place a GBMI defendant in a therapeutic hospital setting.  But when Alaska's GBMI verdict was originally enacted in 1982, the assumption appears to have been that GBMI defendants would be treated in a state hospital, just as they would have been under the prior law which would have found them not guilty by reason of insanity.  Contemporary documents from the time reflect this assumption that GBMI defendants would be treated at the Alaska Psychiatric Institute.  In an article about Alaska's new insanity laws, Dr. Richard R. Parlour and Dr. David J. Sperbeck warned that more needed to be done to ensure that the hospital would be prepared to care for these defendants:

> Almost two years after the new mentally ill offender statute became law in Alaska, the first [GBMI] convicts are presenting themselves for the mandatory treatment at the state hospital.  No special program or facility has been designated for this purpose.  The already over-utilized maximum

---

[21]  Idaho Code § 19-2523(1); *see also* Idaho Code § 19-2522.

[22]  Idaho Code § 19-2523(2); *see also* Idaho Code § 19-2524.

[23]  *See State v. Delling*, 267 P.3d 709, 718 (Idaho 2011).

security unit at the hospital is expected to serve this new patient population.[24]

The shift from hospital placement for GBMI defendants to placement in a correctional facility appears to have been a (perhaps unintended) consequence of an administrative restructuring. In 1982, when the legislation was first enacted, the treatment of GBMI defendants was committed to the authority of a unitary Department of Health and Social Services, which administered both the Alaska Psychiatric Institute and the Division of Corrections.[25] In 1984, however, the department was restructured to create a separate Department of Corrections, and GBMI defendants were then placed under the authority of this new department. This change took place through an executive order, without legislative debate or discussion.[26]

There are also no provisions under Alaska law that treat a finding of GBMI as a mitigating factor that serves to lessen the defendant's culpability or punishment. To the contrary, as this Court has recognized, a finding of GBMI under Alaska law actually serves to *aggravate* a defendant's sentence.[27] Under AS 12.47.050(d), a GBMI defendant is ineligible for parole while they are receiving mental health treatment in prison for their mental illness. They also cannot be released on furlough except to a secured setting. Because the restrictions on parole and furlough essentially serve to

---

[24] Richard R. Parlour & David J. Sperbeck, *The Straits of Insanity in Alaska*, 32 Corrective and Social Psychiatry and Journal of Behavior Technology Methods and Therapy 109, 113 (1986).

[25] *See* SLA 1982, ch. 143, § 22.

[26] *See* Executive Order No. 55, §§ 3-4, 46 (1984).

[27] *State v. Clifton*, 315 P.3d 694, 702 (Alaska App. 2013) (holding that a finding of GBMI is an aggravator that must be found by the jury under *Blakely v. Washington*, 542 U.S. 296 (2004)).

*increase* an Alaska GBMI defendant's incarceration above what would otherwise apply to a non-GBMI defendant, this Court held in *State v. Clifton* that *Blakely v. Washington* required that the finding of "guilty but mentally ill" be made beyond a reasonable doubt by a jury.[28]

In short, Alaska stands in the clear minority of jurisdictions in eliminating moral culpability/wrongfulness from its insanity defense. And Alaska stands virtually alone in failing to provide mitigation to, and hospitalization of, severely mentally ill defendants like Cynthia Lord who have been found to lack the capacity to appreciate the wrongfulness of their actions.

*Prior constitutional challenges to Alaska's GBMI statutes*

The first time this Court addressed the constitutionality of the 1982 revisions to the insanity defense was in 1985, in *Hart v. State*.[29] Unlike Lord, the defendant in *Hart* was not so mentally ill that he was incapable of appreciating the wrongfulness of his conduct. However, his mental illness did mean that he lacked the capacity to conform his conduct to the requirements of the law. In other words, Hart would have qualified as insane under the A.L.I. "volitional prong" definition of insanity but he would not have qualified as insane under the *M'Naghten* rule.[30] Hart argued that a statutory scheme that held a person who lacked substantial capacity to conform their conduct to the requirements of the law criminally responsible violated, *inter alia*, the due

---

[28] *Id.* (citing *Blakely*, 542 U.S. at 303-04).

[29] *Hart v. State*, 702 P.2d 651 (Alaska App. 1985).

[30] *Id.* at 658.

process clauses of the United States and Alaska constitutions.[31]   We rejected this challenge, relying on the United States Supreme Court decision, *Leland v. Oregon*.[32]   In *Leland*, the Supreme Court held that Oregon could choose to adopt the "right and wrong" *M'Naghten* test rather than the "irresistible impulse" test without violating due process.[33]   As the Supreme Court explained:

> Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions.   The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case, but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law.[34]

In *Hart*, this Court adopted this reasoning and concluded that "the state may constitutionally eliminate a separate insanity defense based on 'irresistible impulse' or inability to conform one's conduct to the requirements of the law" without violating the state or federal constitutions.[35]   However, the Court withheld comment on the

---

[31]   *Id.* at 653.  Hart additionally argued that the narrowed NGI defense violated equal protection and was cruel and unusual punishment, but this Court rejected those challenges without detailed analysis.  *Id.* at 653, 658-59.

[32]   *Id.* at 658-59.

[33]   *Leland v. Oregon*, 343 U.S. 790, 800-01 (1952).

[34]   *Id.*

[35]   *Hart*, 702 P.2d at 658-59 (footnote omitted).

legislature's elimination of the wrongfulness prong of the *M'Naghten* test because that issue was not raised by the parties.[36]

Two years later, the Court issued *Patterson v. State*, which made clear that this Court believed that "wrongfulness" was still part of Alaska's insanity test.[37] The Court cited to *Chase v. State*, in which the Alaska Supreme Court treated the two prongs of the *M'Naghten* test as essentially interchangeable.[38] The Court also pointed out that the legislature had modified the cognitive incapacity prong of the *M'Naghten* test from "know" to "appreciate" and "act" to "conduct."[39] The Court therefore concluded this new language — that a defendant must be able "to appreciate the nature and quality of [their] conduct"[40] — must be interpreted broadly rather than restrictively, and must refer both to the defendant's bare awareness of their physical acts and also to their ability to "appreciat[e] the nature and quality of the mental state that accompanied [their] acts."[41] In other words, this Court largely restored the "wrongfulness" component to Alaska's definition of insanity.

---

[36] *Id.* at 658 & n.9.

[37] *Patterson v. State*, 708 P.2d 712 (Alaska App. 1985), *rev'd*, 740 P.2d 944 (Alaska 1987).

[38] *Id.* at 716 (citing *Chase v. State*, 369 P.2d 997, 1001-02 (Alaska 1962), *overruled on other grounds by Schade v. State*, 512 P.2d 907, 910-12 (Alaska 1973).

[39] *Id.* at 716-17.

[40] AS 12.47.010(a).

[41] *Patterson*, 708 P.2d at 717; *cf.* Joshua Dressler, *Kahler v. Kansas: Ask the Wrong Question, You Get the Wrong Answer*, 18 Ohio St. J. Crim. L. 409, 416 (2020) (noting that "[i]n early years, the term 'mens rea' simply meant that an actor committed the offense with a 'morally blameworthy state of mind'").

The Alaska Supreme Court disagreed with this interpretation of the legislative intent. In *State v. Patterson*, the Alaska Supreme Court reversed the decision of the Court of Appeals, and held that Alaska's definition of insanity incorporated only the first prong of the traditional *M'Naghten* insanity defense and did not include the second "wrongfulness" prong.[42] The supreme court declined to decide, however, whether this statutory scheme violated due process, equal protection, or the prohibition against cruel and unusual punishment, concluding that these constitutional questions were not ripe because Patterson's case had to be remanded for a new trial on other grounds.[43] The Alaska Supreme Court has never subsequently ruled on the constitutionality of these issues.

In 1989, in *Barrett v. State*, this Court addressed questions about the constitutionality of the GBMI verdict.[44] In its analysis, the Court relied heavily on its belief that "a person found not guilty by reason of insanity and a person found guilty but mentally ill are treated substantially the same."[45] The Court found their treatment substantially similar because "each person is subjected to mental health treatment calculated to cure the mental illness or defect or to render the defendant less dangerous to the public" and "neither person may be released absent a finding that either the mental illness has been cured or that, despite the mental illness, the defendant is no longer

---

[42] *State v. Patterson*, 740 P.2d at 949.

[43] *Id.* at 949 n.18.

[44] *Barrett v. State*, 772 P.2d 559, 570-74 (Alaska App. 1989). While Barrett raised due process, cruel and unusual punishment, and equal protection claims, his due process and cruel and unusual punishment claims were poorly framed and this Court summarily dismissed them. *Id.* at 573.

[45] *Id.* at 572.

dangerous."[46]  And in either case, "the defendant may not be subjected to compulsory mental health treatment beyond the limits of an appropriate criminal sentence unless the state successfully obtains civil commitment."[47]  The Court did not acknowledge the obvious way in which the two classes of defendants were not treated the same — *i.e.*, that defendants found not guilty by reason of insanity are housed in a therapeutic hospital environment while GBMI defendants are incarcerated in prison.

With this incomplete understanding of the GBMI verdict, the Court rejected Barrett's argument that the restrictions on parole and furlough for GBMI defendants violated equal protection.  The Court concluded that, as to furloughs and discretionary parole, the link between a GBMI defendant's mental illness and their criminal conduct justified treating them like defendants found not guilty by reason of insanity (who are committed to the state hospital and can only be released prior to the expiration of their maximum possible sentence upon a showing of non-dangerousness).[48]  The Court noted that "the procedures at issue here simply require that a responsible trier of fact make an express finding regarding a particular defendant's mental illness and danger before the defendant can be released into the community."[49]  The Court also reasoned that these restrictions were not materially different from the obstacles that regular defendants faced when applying for furlough or discretionary parole because "[n]o responsible correctional official or parole board member would release a person into the community

---

[46]  *Id.* at 572-73.

[47]  *Id.* at 573.

[48]  *Id.* at 573-74.

[49]  *Id.* at 574.

if he or she felt that that person was dangerous."[50]  The Court did not directly address the restriction on mandatory parole in its decision.

Four years later, the Court reaffirmed this reasoning in *Monroe v. State*.[51]  In *Monroe*, the defendant argued that the statutory parole restrictions that applied to GBMI defendants violated equal protection because they did not apply to regular defendants.  The Court held that the restrictions were constitutional because they further the legitimate and substantial state interest of "protect[ing] society from offenders who pose a continuing danger to the community."[52]

The Court noted, however, that Monroe "must be provided some procedural mechanism to seek eligibility for parole or furlough by demonstrating his lack of continued dangerousness."[53]  The Court concluded that this issue was not yet ripe in Monroe's case and it expressed optimism that "[i]n the interim, the Parole Board or the Department of Corrections may promulgate regulations addressing the problem."[54]  (In recent years, the Department of Corrections has issued regulations granting GBMI defendants hearings in which they could demonstrate that they were no longer dangerous

---

[50]  *Id.* at 573.

[51]  *Monroe v. State*, 847 P.2d 84 (Alaska App. 1993).

[52]  *Id.* at 89.  "However, a person who stands to be sentenced upon conviction of a crime has no fundamental right to liberty.  In such cases, 'the individual interest affected . . . is the relatively narrow interest of a convicted offender in minimizing the punishment for an offense.'"  *Id.* (omission in original) (quoting *Maeckle v. State*, 792 P.2d 686, 689 (Alaska App. 1990)).

[53]  *Id.* at 90 n.4.  This Court relied on an analogy to AS 12.47.090(e), which gives "persons who have been committed for treatment following a successful insanity defense the right to petition for review of their need for continued institutionalization."  *Id.*

[54]  *Id.*

as a result of their mental illness.[55] To my knowledge, the adequacy of these regulations has not been tested and I express no opinion as to whether they address the due process problem we identified almost thirty years ago in *Monroe*.)

The next time the Court addressed the constitutionality of the GBMI verdict was in Lord's direct appeal. As mentioned in the majority opinion, Lord's appellate attorney raised multiple constitutional challenges to Alaska's insanity statutory scheme, including the GBMI verdict. Even though some of these arguments had not been raised by Lord's trial attorneys, this Court responded to the arguments on the merits, albeit in a cursory manner. The Court provided very little analysis of Lord's constitutional challenges other than to state that it was adhering to its prior decisions in *Hart* and *Barrett*.[56]

But, as just explained, neither *Hart* nor *Barrett* addressed the real heart of Lord's constitutional challenge — which was essentially that it was unconstitutional to find a defendant criminally culpable and to incarcerate that defendant in a prison setting when, because of the severity of the defendant's mental illness, the defendant lacked the substantial capacity to appreciate the wrongfulness of their conduct.

Indeed, the first part of this question — whether such defendants can be found criminally culpable — was not answered under the federal constitution until just recently, in *Kahler v. Kansas*.[57] Moreover, in answering this question in the affirmative,

---

[55] *See* Alaska Dep't of Corr., Policies and Procedures 807.22, *Due Process Hearings for Prisoners Adjudicated Guilty But Mentally Ill* (2018).

[56] *Lord v. State*, 262 P.3d 855, 861-62 (Alaska App. 2011) (citing *Hart v. State*, 702 P.2d 651, 653-59 (Alaska App. 1985); *Barrett v. State*, 772 P.2d 559, 573 (Alaska App. 1989)).

[57] *Kahler v. Kansas*, 140 S.Ct. 1021 (2020).

the United States Supreme Court relied heavily on precisely those mitigating aspects of the Kansas statutory scheme that are absent from Alaska law.

*The United States Supreme Court's decision in* Kahler v. Kansas *and the constitutional questions that it raises for Alaska's statutory scheme*

In the 2019-2020 term, the United States Supreme Court granted certiorari to a Kansas Supreme Court case, *Kahler v. Kansas*, to decide whether Kansas's abolition of the insanity defense violated the Eighth Amendment and the Fourteenth Amendment.[58] The case resulted in extensive briefing on the history of the insanity defense and the approaches followed by the different jurisdictions. Amicus briefs were filed by multiple organizations on both sides of the issue.

Ultimately, the decision rested only on the question of whether Kansas's abolition of the insanity defense violated the due process clause of the Fourteenth Amendment. The Supreme Court did not reach the Eighth Amendment question because that issue was not properly before it.[59]

In a majority opinion authored by Justice Kagan, six members of the Supreme Court upheld the Kansas law as constitutional.[60] But three justices dissented, essentially agreeing with the position advocated by Lord in her direct appeal — that is, the position that due process requires an insanity defense that acknowledges a defendant's mental capacity to understand the wrongfulness of their actions.[61] Justice Breyer authored the dissent, which was joined by Justices Ginsburg and Sotomayor. In

---

[58]  *Id.* at 1027.

[59]  *Id.* at 1027 & n.4.

[60]  *Id.* at 1027.

[61]  *Id.* at 1038 (Breyer, J., dissenting).

the dissent, Justice Breyer noted that "45 States, the Federal Government, and the District of Columbia continue to recognize an insanity defense that retains some inquiry into the blameworthiness of the accused."[62]  And he further concluded that "[s]even hundred years of Anglo-American legal history, together with basic principles long inherent in the nature of the criminal law itself convince me that Kansas' law 'offends . . . principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"[63]

The majority opinion held otherwise, as we did in *Lord*.  However, the majority opinion rested on different grounds than our opinion in *Lord*.  Central to the majority's holding was the fact that Kansas law allowed evidence of mental illness at sentencing "to mitigate culpability and lessen punishment" and the fact that Kansas law specifically gave the authority to the sentencing judge to "replace any prison term with commitment to a mental health facility."[64]  As the majority opinion states:

> [S]ignificantly, Kansas permits a defendant to offer whatever mental health evidence he deems relevant at sentencing. . . . In other words, any manifestation of mental illness that Kansas's guilt-phase insanity defense disregards — including the moral incapacity Kahler highlights — can come in later to mitigate culpability and lessen punishment.  And that same kind of evidence can persuade a judge to replace any prison term with commitment to a mental health facility.  So as noted above, a defendant arguing moral incapacity may well receive the same treatment in Kansas as in States that would

---

[62]  *Id.* at 1046.

[63]  *Id.* at 1038 (alterations in original) (quoting *Leland v. Oregon*, 343 U.S. 790, 798 (1952)).

[64]  *Id.* at 1031 (majority opinion).

acquit — and, almost certainly, commit — him for that reason.[65]

In other words, the United States Supreme Court upheld Kansas's abolition of the insanity defense, at least in part, because Kansas law still treated severely mentally ill defendants in a manner similar to how they would be treated if they had been found not guilty by reason of insanity.

But this is not true in Alaska. As already explained, Alaska law does not contain the mitigating provisions that Kansas law contains. To the contrary, Alaska appears to be alone in treating severely mentally ill defendants who have been found to lack the capacity to understand the wrongfulness of their actions *more harshly* than it does non-mentally ill defendants who have been convicted of the same crimes.

Alaska's outlier status raises serious constitutional issues not answered by *Kahler*, and not generally addressed by our prior decisions finding Alaska's insanity statutory scheme constitutional.

In *Barrett v. State*, this Court held that Alaska's GBMI statutes did not violate the constitution, but it did so, in part, under the erroneous belief that GBMI defendants were treated "substantially the same" as defendants who were found not guilty by reason of insanity.[66] *Barrett* also failed to acknowledge the singular harshness of Alaska's GBMI verdict and the absence of any mitigating measures in Alaska law for defendants like Cynthia Lord who would still be found not guilty by reason of insanity in the vast majority of jurisdictions in this country.

But, when evaluating whether a punishment is categorically disproportionate for a particular type of offender, courts are required to look at "the

---

[65] *Id.* (citations omitted).

[66] *See Barrett v. State*, 772 P.2d 559, 573 (Alaska App. 1989).

evolving standards of decency that mark the progress of a maturing society."[67]  As a general matter, the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures."[68]  Given Alaska's outlier status, I question whether *Barrett* and the cases that rely on *Barrett* (including *Lord*) are correctly decided.

*Application of these principles to Cynthia Lord's case*

Given our current case law, I agree with the majority opinion that Lord's trial attorneys were not incompetent for failing to raise constitutional claims that, for the most part, appeared to be resolved by our Court.  I also agree with the majority that Lord's free-standing equal protection claim can be litigated as an Eighth Amendment conditions of confinement claim in a separate civil suit.  But as Judge Smith points out in his dissent, there are institutional obstacles that will make it difficult for Lord to bring such a lawsuit.  Moreover, while a conditions of confinement lawsuit may be able to bring relief to Lord personally, it will do nothing to address the structural defects in Alaska's GBMI verdict, which fails to provide hospitalization and mitigation to a class of offenders who would have been found not criminally culpable under long-standing and deeply rooted legal concepts of criminal culpability and moral blameworthiness.

In recent years, the United States Supreme Court has strengthened the protections of the Eighth Amendment by imposing categorical limits on certain

---

[67]  *Abraham v. State*, 585 P.2d 526, 531 (Alaska 1978) (quoting *Rust v. State*, 582 P.2d 134, 142 (Alaska 1978)); *see also Gray v. State*, 267 P.3d 667, 670-71 (Alaska App. 2011) (discussing *Graham v. Florida*, 560 U.S. 48, 60-61, 74-75 (2010), and *Roper v. Simmons*, 543 U.S. 551, 574-75 (2005)).

[68]  *Graham*, 560 U.S. at 62 (quoting *Atkins v. Virginia*, 536 U.S. 304, 312 (2002)).

sentencing practices as they apply to juveniles.[69]  Although *Kahler* did not address the Eighth Amendment, its holding strongly suggests that, like juveniles, severely mentally ill defendants like Lord are less blameworthy than other defendants.  *Kahler* also suggests that while such defendants can be held criminally responsible without offending the due process clause of the federal constitution, mitigation and placement in a therapeutic environment is nevertheless required.

Accordingly, in my view, *Kahler* represents a substantive enough change to the law as to constitute good cause for allowing Lord to file a second application for post-conviction relief raising these constitutional claims under both the state and federal constitutions so that Alaska's outlier status can finally be acknowledged and addressed by the courts.[70]

---

[69]  *See Graham*, 560 U.S. at 82; *Roper*, 543 U.S. at 578; *Miller v. Alabama*, 567 U.S. 460, 489 (2012); *Montgomery v. Louisiana*, 136 S.Ct. 718, 734 (2016).

[70]  *Cf. Hall v. State*, 446 P.3d 373, 378 (Alaska App. 2019) (holding that a "due process exception exists for claims of newly discovered evidence of innocence"); *Grinols v. State*, 74 P.3d 889, 896 (Alaska 2003) (holding that a "defendant must be given the opportunity to challenge the effectiveness of counsel in a second petition for post-conviction relief").

Senior Superior Court Judge SMITH, concurring and dissenting.

I concur with the Court's decision insofar as it rejects Lord's equal protection claim and her claims regarding the failure to interview Dr. Sperbeck but write separately to highlight my concerns regarding the issues raised in Dr. Sperbeck's affidavit. I dissent from the decision as it applies to whether Lord suffered prejudice due to her attorneys' failure to file a constitutional challenge to the preclusion of mandatory parole for GBMI defendants. I will address each point in turn.

*Lord's challenge to the conditions of confinement*

In a supporting affidavit, Lord's expert witness Paul Maslakowski stated that he believed Lord's attorneys should have filed a constitutional challenge to the requirement that GBMI defendants be placed in Department of Corrections custody. I concur with the Court's holding that Lord was not prejudiced by the failure to file this motion (and the concomitant failure to interview Dr. Sperbeck). But I think that the issues raised by Dr. Sperbeck's affidavit warrant attention. That affidavit raised significant issues regarding the disparate treatment of GBMI and NGI defendants, ones that clearly call into question the constitutionality of that disparate treatment — not to mention the efficacy of the treatment that GBMI defendants currently receive. It is unfortunate that under Alaska case law, Lord must challenge this disparity in a civil case,[1] where she has no guarantee of finding either an attorney to represent her or the funding that probably would be required to maintain the suit, given the probable need for

---

[1]    *See, e.g.*, *Abraham v. State*, 585 P.2d 526, 531-34 (Alaska 1978) (recognizing that an independent civil action is the proper vehicle for seeking rehabilitative treatment while in custody).

expert witnesses. This in turn only underlines how profoundly the GBMI verdict is in no way of any value to a defendant found to be GBMI — it condemns them to treatment far worse than that afforded their counterparts who are not guilty by reason of insanity or in whose cases competence has never been raised. I note in this respect that perhaps the ultimate insult here is that Lord, like most GBMI defendants, did not raise this defense or acquiesce to the damaging verdict that resulted — it was thrust upon her by the State, once she raised an insanity defense.

*Lord's claim of prejudice resulting from the failure to challenge the restriction on mandatory parole*

Maslakowski also stated in his affidavit that Lord's attorneys should have filed a constitutional challenge to the preclusion of mandatory parole for GBMI defendants. The Court rejects Lord's claim that she was not afforded effective assistance of counsel by her attorneys' failure to file this motion because Lord suffered no prejudice due to its subsequent decision in *State v. Clifton*.[2] I respectfully disagree, for I believe that, for the reasons that follow, the provision precluding mandatory parole is unconstitutional, and to the extent this Court's ruling in *Clifton* upholds that provision, *Clifton* should be overruled.

Lord contends that her ineligibility for mandatory parole as a GBMI defendant violates her right to equal protection because there are dangerous non-GBMI defendants who are eligible for mandatory parole even if they remain dangerous at the time of their release. The Court now holds that while Lord's attorney incompetently failed to file a motion challenging the preclusion of mandatory parole, Lord nevertheless suffered no prejudice from her attorneys' failure to raise this claim because this Court

---

[2] *State v. Clifton*, 315 P.3d 694, 703-05 (Alaska App. 2013).

subsequently concluded in *Clifton* that the preclusion of mandatory parole for GBMI defendants did not violate equal protection.

Alaska Statute 12.47.050(d) precludes a GBMI defendant from being released on furlough or parole unless they are no longer receiving the treatment required by AS 12.47.050(b). That treatment, in turn, is required "until the defendant no longer suffers from a mental disease or defect that causes the defendant to be dangerous to the public peace or safety."[3] This means that a GBMI defendant cannot be released unless and until they no longer are dangerous, as determined by the Department of Corrections in the course of that defendant's treatment. And since this prohibition applies to "parole," it necessarily applies to both mandatory and discretionary parole.[4]

As the Court notes, this Court did consider and reject a constitutional claim against the preclusion of parole in *Clifton*. The appellant in *Clifton* there contended that the statute equated mental illness with dangerousness. This Court rejected that argument for two reasons: (1) the statute required the State to prove both "that the defendant suffered from a mental illness *and* that, because of this mental illness, the defendant lacked the substantial capacity to appreciate the wrongfulness of their conduct or to confirm their conduct to the requirements of the law," and (2) only defendants who were found to be dangerous are required to undergo treatment.[5]

The Court also rejected Clifton's argument that there was "no good reason to impose additional restrictions on the parole eligibility of [GBMI defendants] — no good reason to conclude that [GBMI defendants] pose a greater danger to the public than

---

[3] AS 12.47.050(b).

[4] AS 12.47.050(d)(2).

[5] *Clifton*, 315 P.3d at 703.

[non-GBMI defendants]."[6] The Court reasoned that the legislature could reasonably conclude that the mental disease or defect suffered by a GBMI defendant was "important to any assessment of whether the defendant can be safely released on parole or furlough" and hence that GBMI defendants "will be significantly less receptive to parole supervision and control."[7] This Court did, however, point to a potential due process issue, noting that there was no procedure by which a GBMI defendant could prove that they were no longer dangerous and hence should be eligible for release on parole.[8] This Court concluded, however, that this issue was not ripe for review, since Clifton would not be eligible for discretionary parole for several years.[9]

Because Lord's argument here is virtually identical to that raised in *Clifton*, it would appear to be precluded by the holding in that case. I note at the outset that it is not entirely clear that *Clifton* did in fact address the preclusion of mandatory parole; while the Court's language appears to apply to both types of parole, the Court confined its due process discussion and analysis to discretionary parole.[10] But even if *Clifton* did uphold the preclusion of mandatory parole against an equal protection challenge, I believe that the Court's holding was erroneous and that this Court should conclude that AS 12.47.050(d) is unconstitutional to the extent that it precludes mandatory parole for GBMI defendants.

Alaska Statute 33.16.010(c) provides, in relevant part, that an incarcerated individual serving a term of two or more years "shall be released on mandatory parole

---

[6]   *Id.* at 704.

[7]   *Id.*

[8]   *Id.* at 704-05.

[9]   *Id.*

[10]   *Id.* at 703-05.

for the term of good time deductions credited under AS 33.20." Alaska Statute 33.20.010(a), in turn, governs the calculation of good time, stating that incarcerated prisoners are "entitled to a deduction of one-third of the term of imprisonment rounded off to the nearest day *if the prisoner follows the rules of the correctional facility in which the prisoner is confined*."[11] Alaska Statutes 33.20.030 and 33.20.040(a) then confirm that each such individual "shall be released at the expiration of the term of sentence less the time deducted for good conduct," with individuals on mandatory parole released to the "custody and jurisdiction of the parole board."

The loss of good time is confined by both statute and regulation to whether the prisoner follows the rules of the facility in which they are housed. In particular, AS 33.20.050 provides that "[i]f during the term of imprisonment a prisoner commits an offense or violates the rules of the correctional facility, all or part of the prisoner's good time may be forfeited under regulations adopted by the commissioner of corrections." Those regulations, in turn, define more specifically the conduct for which good time may be forfeited and the procedures to be used to determine if good time should be forfeited.[12] All of the specified conduct relates to what the individual does at the facility.[13]

The key point here is that an individual can lose the opportunity to be released on mandatory parole if and only if they do not follow the rules of the facility — there is no provision that allows the Department of Corrections to refuse to release an

---

[11]   (Emphasis added).

[12]   22 Alaska Administrative Code (AAC) 05.470 (describing the procedures and types of punishment available for infractions committed in a state facility, including the loss of good time).

[13]   22 AAC 05.400 (describing prohibited conduct punishable by disciplinary action).

individual on mandatory parole because they present a danger to the public.[14] Thus, all non-GBMI individuals *must* be released even if they are dangerous, provided they have not lost their good time, while GBMI defendants *cannot* be released if they remain dangerous, even if they have not lost their good time.

Aside from GBMI defendants, there are four categories of incarcerated individuals who are not eligible for mandatory parole: (1) those sentenced to a mandatory 99-year term for first-degree murder; (2) those sentenced to a definite term of 99 years under AS 12.55.125(l); (3) those who committed certain sexual felonies; and (4) those sentenced for an unclassified felony under AS 11.41.100 or AS 11.41.110 (first- or second-degree murder).[15] All of these categories focus on individuals who have committed very serious crimes against a person, which suggests that they were adopted because the legislature believed that individuals who committed these crimes were too dangerous to be released on mandatory parole. That is, these categories are tied to the *underlying crime* of the defendant, not to their personality or any mental health issues they may have.

GBMI defendants are treated very differently. They cannot be released on mandatory parole unless and until they are determined not to be dangerous.[16] This indicates that the legislature presumed that, unless proved otherwise on a case-by-case basis, GBMI defendants are inherently dangerous due to the fact that they suffered from a mental defect or disease that caused them to lack the substantial capacity either to

---

[14] *Id.* However, the Alaska Parole Board may refuse to release an individual on discretionary parole if, *inter alia*, they "pose a threat of harm to the public if released on parole." AS 33.16.100(a)(3).

[15] AS 33.20.010(a).

[16] AS 12.47.050(b), (d); *see also State v. Clifton*, 315 P.3d 694, 703 (Alaska App. 2013).

appreciate the wrongfulness of their conduct or to conform that conduct to the requirements of the law.[17] Put differently, unlike all other defendants who are ineligible for mandatory parole, GBMI defendants are precluded from mandatory parole not by virtue of their conduct, but by virtue of their status as GBMI.

In short, GBMI defendants are treated differently from all other defendants in two respects: (1) they cannot be released on mandatory parole if they remain dangerous, even if they otherwise qualify for release for good time, and (2) this preclusion is based not on their underlying crime, but on the fact that they suffer from a particular form of mental disease or defect.

The Court's reasons for rejecting similar arguments in *Clifton* were erroneous. As noted above, the Court first rejected the claim that the statute equated mental illness with dangerousness because the State must prove both that the defendant suffered from a mental illness and that that illness met the criteria set forth in AS 12.47.030(a).[18] But this misses the point. The Court conceived the issue as relating to mental illness in general, but the statute actually defines a *particular type* of mental illness: a mental illness that causes a person to lack the substantial capacity either to appreciate the wrongfulness of their conduct or to conform that conduct to the requirements of the law.[19] In so doing, the statute necessarily ties individuals suffering from a particular kind of mental illness to dangerousness, thereby equating such individuals with being dangerous.

It is true that the Court implicitly addressed this problem in noting that only dangerous GBMI defendants may be precluded from being released on mandatory

---

[17] *See* AS 12.47.030(a).

[18] *Clifton*, 315 P.3d at 703.

[19] AS 12.47.030(a).

parole.[20] But as noted above, only GBMI defendants are subject to a requirement that they affirmatively be found not to be dangerous while other defendants may be released even if they are still dangerous. The Court rejected an argument that these differences violated equal protection on the grounds that the legislature could reasonably determine that, by virtue of their mental defect or disease, GBMI defendants would be less amenable to supervision on parole.[21] But there are four problems with this analysis.

First, this reasoning misses the central point of mandatory parole: unlike discretionary parole, mandatory parole is based purely on an individual's behavior in prison, not on their general amenability to supervision after release, and there is no reason why a GBMI defendant who follows the rules while in prison necessarily will fail on parole once released.

Second, in relying solely on amenability to supervision, this analysis undercuts the Court's reasoning in upholding the preclusion of mandatory parole. A GBMI defendant who is not dangerous can be released, notwithstanding the fact that they continue to suffer from the type of mental disease or defect that, in the legislature's view, rendered them unamenable to supervision. And if that disease or defect is the bar to release, then there is no reason to confine the preclusion of mandatory parole to dangerous GBMI defendants.

This suggests that the real issue for the legislature was its concern over the dangerousness of GBMI defendants, not their amenability to supervision, which leads to the third problem with respect to the entitlement to mandatory parole: there simply is no necessary link between dangerousness and success on mandatory parole. In particular, if the legislature was willing to let all defendants other than GBMI defendants

---

[20]  *Clifton*, 315 P.3d at 703.

[21]  *Id.* at 704.

be released even if they are dangerous, provided that they complied with the rules of the institution, then there is no basis on which to find that dangerous GBMI defendants who would otherwise qualify for good time should not be released.

The final problem relates to the requirement that GBMI defendants affirmatively be found not to be dangerous before they can qualify for release on mandatory parole. As noted above, this Court explained in *Clifton* that the lack of any statutory procedure by which a GBMI defendant could prove that they are no longer dangerous could present a violation of due process.[22] The Department of Corrections subsequently promulgated a policy that, on its face at least, resolves that due process concern. It sets forth a process by which a GBMI defendant can request a hearing to determine whether they no longer are dangerous to public health and safety.[23] I express no opinion as to whether these procedures in fact provide adequate due process, but they do not address the equal protection problem presented by the preclusion on mandatory parole. In particular, all incarcerated individuals who are not GBMI are released as a matter of right if they otherwise qualify for good time — they do not have to request a hearing, and not only are they free from the burden of proving they are not dangerous, they can be released even if they are dangerous. GBMI defendants who qualify for good time cannot be released unless they first request and participate in a hearing, and they must provide proof that they are no longer dangerous. And for the reasons identified above, there is no rational basis for requiring only GBMI defendants to participate in a hearing before they can be released.

---

[22] *Id.* at 704-05.

[23] Alaska Dep't of Corr., Policies and Procedures 807.22, *Due Process Hearings for Prisoners Adjudicated Guilty But Mentally Ill* (2018).

This last point is particularly significant given the broad range of defendants who may be found GBMI. The verdict of guilty but mentally ill is not confined to crimes against a person, much less to violent crimes. Rather, it broadly applies to all crimes, the vast bulk of which do not involve any violent behavior at all. For example, a defendant can be found GBMI in the context of an escape from prison, which is a victimless crime.[24] Yet, all of these individuals must request a hearing before they can be released on mandatory parole. There simply is no reason why they should be required to do so.

In short, there is no constitutional basis for the differential treatment GBMI defendants receive with respect to the preclusion of mandatory parole. Lord therefore was prejudiced by her attorneys' failure to make this claim. I accordingly respectfully dissent from the Court's conclusion to the contrary.

---

[24] *See Barrett v. State*, 772 P.2d 559 (Alaska App. 1989) (upholding GBMI statute in a case involving second-degree escape).